### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

DISTRICT HOSPITAL PARTNERS, L.P., d/b/a )
The George Washington University Hospital, et al., )
                                  )
           Plaintiffs         )
                                  )
           v.              )      Civil Action No. 11-cv-116 (ESH)
                                  )
KATHLEEN SEBELIUS, Secretary, Department of )
Health and Human Services,           )
                                  )
           Defendant        )

### MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM

### PRELIMINARY STATEMENT

A provision of the Medicare Act allows a hospital participating in Medicare to request an additional "outlier" payment from Medicare when it treats an extreme case in which the hospital's estimated costs exceed the standard Medicare payment by more than a certain dollar amount. This dollar-amount cutoff point, the "fixed loss threshold," is set every year by the Secretary of Health and Human Services based on the projected total of payments that the Secretary expects to make to all hospitals. See 42 U.S.C. § 1395ww(d)(5)(A)(ii)–(iv). The plaintiffs in this action claim that from fiscal year 2004 to fiscal year 2006, they received fewer and lower outlier payments than they should have, either because the Secretary set the fixed loss threshold improperly, because the Secretary's total outlier payments to all hospitals fell short of a required minimum level, or because the Secretary should have readjusted the fixed loss threshold in the middle of each year or should have made adjustments to the process for reconciling claims for Medicare payments. The plaintiffs' claims should be dismissed for lack of subject matter jurisdiction or failure to state a claim.

This Court lacks subject matter jurisdiction over any claim based on an argument that the Secretary was required to readjust the fixed loss threshold in the middle of each fiscal year or that the Secretary failed to consider making adjustments to the process for reconciling claims for Medicare payments. The Supreme Court and the D.C. Circuit have made clear that claims arising under the Medicare Act must be channeled through the exclusive administrative and judicial review procedures provided under the Medicare Act. The plaintiffs did not raise any arguments related to either midyear adjustments or the reconciliation process when they brought administrative proceedings before the Medicare Provider Reimbursement Review Board, so they cannot raise such claims now before this Court.

These claims and the other claims in the plaintiffs' complaint also fail to state a claim upon which relief can be granted. The plaintiffs' assertion that the Secretary's total outlier payments to all hospitals must add up to a certain minimum level is directly contradicted by D.C. Circuit precedent. The D.C. Circuit held in County of Los Angeles v. Shalala, 192 F.3d 1005 (D.C. Cir. 1999), that the governing statute, 42 U.S.C. § 1395ww(d)(5)(A)(iv), simply directs the Secretary to set the fixed loss threshold in advance of each fiscal year based on reasonable projections about the total payments to be made in the coming year. The D.C. Circuit explained that the Secretary is not required to retroactively adjust the fixed loss threshold, make additional payments to hospitals, or demand refunds from hospitals if actual outlier payments fail to match up with her earlier projections. For the same reason, the statute does not require that the Secretary make midyear adjustments to the fixed loss threshold to ensure that actual outlier payments will match her projections more closely.

Finally, the plaintiffs' challenge to the specific methods the Secretary used to make her payment projections also fails to state a claim. The plaintiffs' assertion that the Secretary failed to

consider pertinent factors or data, or failed to consider alternative predictive methods, is contradicted by the agency's notices in the Federal Register explaining the reasons for the Secretary's choices. The D.C. Circuit has repeatedly recognized that when a statute calls on an agency to make projections or predictions, the agency has broad discretion over the methods it uses to make those projections. As long as the agency acknowledges factual uncertainties and identifies the considerations it found persuasive, its choice of predictive methods is lawful. The Secretary's explanations in the Federal Register were more than sufficient to meet this deferential standard.

Accordingly, the Court should dismiss the plaintiffs' complaint.

## BACKGROUND

I.    **Statutory and Regulatory Background**

A.    **The Medicare Inpatient Prospective Payment System**

The Medicare program, established under title XVIII of the Social Security Act of 1935, 42 U.S.C. § 1395 et seq., provides federally funded medical insurance to elderly and disabled persons. Medicare sets out a "complex statutory and regulatory regime," Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 404 (1993), under which hospitals can obtain payment from the Medicare program for services that they provide to patients covered by Medicare.

The Medicare program generally does not reimburse hospitals for the actual operating costs that they incur in providing inpatient care. Instead, hospitals are paid at fixed rates under a scheme known as the Inpatient Prospective Payment System (IPPS). See Cnty. of Los Angeles v. Shalala, 192 F.3d 1005, 1008 (D.C. Cir. 1999). The Secretary defines categories of medical conditions known as "diagnosis related groups" (DRGs). See id. For each DRG, the Secretary determines a standard payment amount, the "DRG prospective payment rate," intended to reflect the estimated average cost of treating a patient whose condition falls within that DRG. See id. at

1008–09. For each case that a hospital treats, Medicare generally pays the hospital the DRG prospective payment rate that corresponds to the patient's diagnosis, even though the actual cost the hospital incurs in treating that patient may be much higher or lower than the DRG prospective payment rate. Consequently, a hospital stands to come out ahead financially each time it treats a case in which its costs fall below the DRG prospective payment rate, but stands to lose financially each time it treats a case in which its costs exceed the DRG prospective payment rate.

### B.    Medicare Outlier Payments

A hospital's gains and losses may even out over numerous cases, or they may not. A hospital that incurs lower-than-average costs in a great many cases may experience large net gains, while a hospital that incurs higher-than-average costs in a large number of cases—whether because the hospital operates inefficiently or merely because it has run into a string of unusually complicated cases—may face losses. Payments generally are not adjusted to reflect ordinary variations of this kind. However, to lessen the financial blow that rare, exceptionally costly cases might impose on hospitals, Congress has provided for additional "outlier" payments to partly offset extremely high costs in some rare cases. Outlier payments are governed by 42 U.S.C. § 1395ww(d)(5)(A), which provides:

> (ii) . . . [A hospital paid under the PPS] may request additional payments in any case where charges, adjusted to cost, . . . exceed the sum of the applicable DRG prospective payment rate plus any amounts payable under subparagraphs (B) and (F) plus a fixed dollar amount determined by the Secretary.
>
> (iii) The amount of such additional payment . . . shall be determined by the Secretary and shall . . . approximate the marginal cost of care beyond the cutoff point applicable under clause . . . (ii).

Id. § 1395ww(d)(5)(A)(ii)–(iii). The Secretary has promulgated regulations implementing § 1395ww(d)(5)(A) at 42 C.F.R. §§ 412.80 to .86.

4

Whether a case is eligible for an outlier payment depends on the approximate actual cost the hospital has incurred in treating that case.[1] A hospital's exact costs for a given case cannot be readily discerned, so the statute specifies that the Secretary is to estimate a hospital's costs based on the charges the hospital has billed for covered services in the case. See 42 U.S.C. § 1395ww(d)(5)(A)(ii) ("charges, adjusted to cost"). The Secretary estimates a hospital's costs for a case by multiplying the hospital's charges by a "cost-to-charge ratio," a fraction that represents the estimated amount that the hospital incurs in costs for every dollar that the hospital bills in charges. Generally, a hospital's cost-to-charge ratio is calculated individually for that hospital based on historical cost and charge data contained in reports the hospital has submitted to Medicare in the past. See 42 C.F.R. § 412.84(i) (2006).

Each fiscal year, the Secretary determines a "fixed dollar amount," 42 U.S.C. § 1395ww(d)(5)(A)(ii), that is to serve as a "cutoff point," id. § 1395ww(d)(5)(A)(iii), also known as the "fixed loss threshold." If a hospital's estimated costs for a case exceed the sum of the DRG prospective payment rate and the fixed loss threshold,[2] then the case is eligible for an outlier payment. See id. § 1395ww(d)(5)(A)(ii); 42 C.F.R. § 412.80(a)(3) (2002).[3]

---

[1] Before fiscal year 1997, the statute also authorized a second category of outlier payments based on the length of the patient's stay in the hospital. See 42 U.S.C. § 1395ww(d)(5)(A)(i). These "day outlier" payments are not at issue in this litigation.

[2] The sum of the DRG prospective payment rate, applicable add-on payments, and the fixed loss threshold is sometimes known as the "outlier threshold" or the "fixed loss cost outlier threshold." This memorandum attempts to avoid using these terms in light of their confusing similarity to the term "fixed loss threshold."

[3] For the sake of simplicity, this discussion disregards two details of the calculation of outlier payments that do not appear to be in dispute in this case:

First, hospitals may receive certain add-on payments on top of the DRG prospective payment rate for indirect costs of graduate medical education, 42 U.S.C. § 1395ww(d)(5)(B), for serving a disproportionate share of low-income patients, id. § 1395ww(d)(5)(F), or for the costs of new medical services and technologies, id. § 1395ww(d)(5)(K). Any such payments are added to the DRG prospective payment rate in the calculation that determines whether a given case (continued . . .)

The amount of the outlier payment is "determined by the Secretary" and is to "approximate the marginal cost of care beyond the cutoff point." 42 U.S.C. § 1395ww(d)(5)(A)(iii). This means the outlier payment is to reflect the amount by which the estimated cost of treating the case exceeds the sum of the DRG prospective payment rate and the fixed loss threshold. Essentially, the fixed loss threshold represents the dollar amount of loss that a hospital must absorb on its own in any case in which the hospital incurs costs greater than the DRG prospective payment rate—hence the term "fixed loss threshold." In any given case, the hospital must always absorb any loss up to the fixed loss threshold, but if the hospital faces a loss greater than the fixed loss threshold, the hospital will receive outlier payments proportionate to the amount by which the hospital's loss exceeds the fixed loss threshold. During the time period at issue in this case, the Secretary's regulations generally provided for outlier payments equal to 80 percent of any difference between the hospital's loss and the fixed loss threshold. See 42 C.F.R. § 412.84(k) (2003).

To illustrate, suppose that in fiscal year 1998, a hospital incurred an estimated cost of $72,000 in treating a Medicare-covered patient who required a pituitary procedure.[4] In fiscal year 1998, the applicable DRG for adrenal and pituitary procedures was DRG 286, and the standard payment from Medicare for cases in that DRG was $8,002.49. The fixed loss threshold set by the Secretary for fiscal year 1998 was $11,050. To determine whether the case is eligible for an outlier payment, the Secretary calculates the sum of the $8,002.49 DRG payment and the

---

qualifies for an outlier payment. See id. § 1395ww(d)(5)(A)(ii) (referring to "amounts payable under subparagraphs (B) and (F)"); 42 C.F.R. § 412.80(a)(2)–(3) (2002).

Second, the fixed loss threshold is also adjusted by a local wage index to account for geographic variations in costs. See 42 C.F.R. § 412.80(a)(2)–(3) (2002).

[4] The figures in this illustration are taken from an August 29, 1997, Federal Register notice. Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1998 Rates, 62 Fed. Reg. 45,965, 45,997–98 (Aug. 29, 1997).

$11,050 fixed loss threshold, which works out to $19,052.49. Because the hospital's estimated costs of $72,000 exceed the $19,052.49 figure, the case is eligible for an outlier payment. To determine the amount of the outlier payment, the Secretary calculates the difference between the hospital's estimated costs of $72,000 and the $19,052.49 figure, which works out to $52,947.51. The hospital will receive an outlier payment equal to 80 percent of the $52,947.51 difference. Rounding to the nearest cent, this produces an outlier payment of $42,358.01.

Another way to look at this calculation is to follow what portions of the hospital's costs are absorbed by the hospital as losses and what portions are compensated by Medicare payments. Without any outlier payments, the hospital in this illustration would lose $63,997.51 from treating the case—the difference between the hospital's estimated costs of $72,000 and the $8,002.49 DRG payment from Medicare. The hospital must absorb all losses up to the fixed loss threshold; that is, the hospital must absorb all of the first $11,050 of the $63,997.51 loss. Of the remaining $52,947.51 of loss, 80 percent will be compensated by an outlier payment, and 20 percent will be absorbed by the hospital. So the $52,947.51 breaks down into $42,358.01 for which the hospital receives a Medicare outlier payment and $10,589.50 that the hospital must absorb as a loss. The total losses absorbed by the hospital comprise the fixed loss threshold amount, $11,050, plus 20 percent of the hospital's loss above the fixed loss threshold, $10,589.50—$21,639.50 in all.

As noted above, § 1395ww(d)(5)(A)(ii) specifies that the fixed loss threshold is to be "determined by the Secretary." Id. The only constraint on the Secretary's determination of the fixed loss threshold is set out in § 1395ww(d)(5)(A)(iv):

> (iv) The total amount of the additional payments made under this subparagraph for discharges in a fiscal year may not be less than 5 percent nor more than 6 percent of the total payments projected or estimated to be made based on DRG prospective payment rates for discharges in that year.

<u>Id.</u> Under the Secretary's interpretation of this provision, which was considered and upheld by the D.C. Circuit in <u>County of Los Angeles v. Shalala</u>, 192 F.3d 1005 (D.C. Cir. 1999), the Secretary must set the fixed loss threshold in advance of each fiscal year based on projections she makes about aggregate payments to hospitals: the Secretary must first make a projection estimating the overall total of ordinary payments the Medicare program will make in the coming fiscal year based on DRG prospective payment rates. The Secretary must also make a prediction about the patterns in which per-case costs will happen to fall relative to DRG prospective payment rates. The Secretary must then set the fixed loss threshold high enough that the overall total of predicted outlier payments does not exceed 6 percent of the predicted total of payments based on DRG prospective payment rates, but low enough that the overall total of predicted outlier payments amounts to at least 5 percent of the projected total of payments based on DRG prospective payment rates. <u>See</u> <u>Cnty. of Los Angeles</u>, 192 F.3d at 1013, 1020 (discussing the Secretary's interpretation of § 1395ww(d)(5)(A)(iv) and upholding it as a reasonable interpretation of the statutory language). In each of the fiscal years at issue in this case, the Secretary set fixed loss thresholds so that predicted total outlier payments would equal 5.1 percent of the predicted total of payments based on DRG prospective payment rates. <u>See</u> Compl. for Declaratory Relief and for Sums Due Under the Medicare Act ¶ 16, ECF No. 1; Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates, 68 Fed. Reg. 45,345, 45,478 (Aug. 1, 2003).

The Secretary determines the appropriate level for the fixed loss threshold by calculating simulated payments based on past charges: The Secretary starts with historical data on charges actually submitted by hospitals and multiplies the data by an inflation adjustment factor to produce an approximation of what hospital charges might look like in the coming year. The

Secretary then feeds the inflation-adjusted data into the payment calculation mechanism that will be in effect in the coming year and tallies the simulated payments that result when the fixed loss threshold is set at different possible levels. See, e.g., 68 Fed. Reg. at 45,476 ("To calculate the FY 2004 outlier thresholds, we simulated payments by applying FY 2004 rates and policies using cases from the FY 2002 MedPAR file."). During the time period at issue in this case, the Secretary performed the inflation adjustment by examining data from two recent years, measuring the rate of change in hospital charges per case between those two years, and then using that rate of change as an adjustment factor to convert historical charges into projected future charges. See id. (explaining that the inflation adjustment used in projecting fiscal year 2004 payments was the "2-year average annual rate of change in charges per case from FY 2000 to FY 2001"); Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates, 69 Fed. Reg. 48,915, 49,277 (Aug. 11, 2004) (explaining that the inflation adjustment used in projecting fiscal year 2005 payments was the "annual rate of change in charges" as measured by comparing the "first half-year of data from FY 2003" and the "first half year of data for FY 2004"); Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006 Rates, 70 Fed. Reg. 47,277, 47,494 (Aug. 12, 2005) (explaining that the inflation adjustment used in projecting fiscal year 2006 payments was a "charge inflation factor based on the first six months of FY 2005 relative to the same period for FY 2004").

The D.C. Circuit explained in County of Los Angeles that the statute does not require the Secretary to ensure that the actual total of outlier payments made in a fiscal year ultimately matches up with her earlier projections for that fiscal year. If it later turns out that the actual total of outlier payments made in a given fiscal year does not fall between 5 percent and 6 percent of

the actual total of payments made based on DRG prospective payment rates, the Secretary has no

obligation to change the fixed loss threshold for the fiscal year or recalculate outlier payments

using a revised fixed loss threshold. See Cnty. of Los Angeles, 192 F.3d at 1013, 1020. So if

actual outlier payments ultimately add up to less than 5 percent of actual payments based on

DRG prospective payment rates, the Secretary does not make additional outlier payments to

bring the total up to 5 percent. Likewise, if actual outlier payments add up to more than 6 percent

of actual payments based on DRG prospective payment rates, the Secretary does not require

hospitals to refund outlier payments to the Hospital Insurance Trust Fund to bring the total down

to 6 percent. See id. at 1019–20; Medicare Program; Changes to the Hospital Inpatient

Prospective Payment Systems and Fiscal Year 1998 Rates, 62 Fed. Reg. 45,965, 46,011 (Aug. 29,

1997) ("[O]nce the payment parameters and adjustments are established for a fiscal year, we do

not make retroactive adjustments based on differences between estimated and actual payments,

whether actual payments are higher or lower than estimated payments."); 70 Fed. Reg. at 47,495

("[C]onsistent with the policy and statutory interpretation we have maintained since the inception

of the [Inpatient Prospective Payment System], we do not make retroactive adjustments to outlier

payments to ensure that total outlier payments in a past year are equal to 5.1 percent of total

DRG payments.").

  To offset the cost of outlier payments, 42 U.S.C. § 1395ww(d)(3)(B) provides that

ordinary payments based on DRG prospective payment rates are to be reduced by a percentage

equal to the Secretary's target percentage for outlier payments. See id. The amounts subtracted

from hospital payments under § 1395ww(d)(3)(B) are sometimes colloquially described as

funding an "outlier pool" from which outlier payments are made. See, e.g., Compl. ¶ 13, Compl.

Ex. D at 2 (asserting that the Secretary "failed to pay out the total amount of the outlier pool").

However, the "outlier pool" does not actually exist as a discrete pool of funds. The amounts subtracted from ordinary Medicare payments under § 1395ww(d)(3)(B) are not actually set aside or earmarked for outlier payments, and outlier payments are neither drawn from nor limited to the amount of funds subtracted from ordinary payments under § 1395ww(d)(3)(B). Rather, a hospital's outlier payments are made out of the Hospital Insurance Trust Fund based strictly on the applicable fixed loss threshold and the hospital's estimated costs. The total amount of outlier payments in any given year may be—and indeed, almost certainly will be—either greater than or less than the total amount of funds subtracted from payments under § 1395ww(d)(3)(B). See generally 62 Fed. Reg. at 46,011 ("We do not set aside a pool of money to fund outlier cases. Moreover, once the payment parameters and adjustments are established for a fiscal year, we do not make retroactive adjustments based on differences between estimated and actual payments, whether actual payments are higher or lower than estimated payments.").

       As explained above, Congress directed in 42 U.S.C. § 1395ww(d)(5)(A)(ii) that the Secretary is to determine the costs a hospital has incurred for a given case by estimating the hospital's costs based on the charges the hospital has billed for that case. See id. (providing for outlier payments based on "charges, adjusted to cost"). The statutory scheme thus relies on a basic assumption that a hospital's billed charges will generally bear a reasonable and predictable relationship to the costs incurred by the hospital. Unfortunately, in some past years, some hospitals participating in Medicare unlawfully exploited this feature of the outlier payment system to obtain greater outlier payments. These hospitals simply padded their billed charges, making it appear that they were incurring greater costs and were entitled to greater outlier payments.

In 2003, the Secretary refined the system in response to the emergence of abusive charging practices by some hospitals. The Secretary implemented changes to the outlier payment scheme to ensure that the calculation of a hospital's cost-to-charge ratio each year would keep pace with recent changes in the proportional relationship between hospitals' charges and their costs. See Medicare Program; Change in Methodology for Determining Payment for Extraordinarily High-Cost Cases (Cost Outliers) Under the Acute Care Hospital Inpatient and Long-Term Care Hospital Prospective Payment Systems, 68 Fed. Reg. 34,493, 34,497–500 (June 9, 2003). As a further check against abuse, the Secretary's 2003 regulations additionally provided that outlier payments for a hospital could later be revised after the cost and charge data submitted by the hospital had been reviewed and audited. See id. at 34,500–04.

### C.    Judicial review under the Medicare Act

Hospitals' payments for Medicare services are calculated and processed by private companies that were formerly known as fiscal intermediaries, see Palisades Gen. Hosp. Inc. v. Leavitt, 426 F.3d 400, 401 (D.C. Cir. 2005), and are now known as Medicare administrative contractors, see 42 U.S.C. § 1395h(a). After a fiscal intermediary has determined the amount of a hospital's payments, the hospital can appeal the fiscal intermediary's determination before the Provider Reimbursement Review Board. See Palisades Gen. Hosp. Inc., 426 F.3d at 401; 42 U.S.C. § 1395oo(a); see also id. § 1395oo(b) (providing for group appeals by multiple providers). If the hospital believes the Board lacks authority to decide some "question of law or regulations relevant to the matters in controversy," the hospital can request that the Board make a determination "that it is without authority to decide the question" and authorize expedited judicial review in federal district court. See 42 U.S.C. § 1395oo(f)(1); Heartland Reg'l Med. Ctr. v. Leavitt, 415 F.3d 24, 27 (D.C. Cir. 2005).

## II.    The plaintiffs' complaint

The plaintiffs in this action own and operate 186 hospitals that participate in the Medicare program. Compl. ¶¶ 1, 7, 20. The plaintiffs are challenging the amounts of outlier payments they received for services provided between fiscal year 2004 and fiscal year 2006. See Compl. ¶¶ 1–3.

The plaintiffs in this action brought various appeals before the Provider Reimbursement Review Board and requested expedited judicial review in those appeals.[5] Compl. ¶¶ 21–22. The Provider Reimbursement Review Board authorized expedited judicial review in three notices dated November 17, 2010. Compl. ¶¶ 22 and Exs. A–C; see 42 U.S.C. § 1395oo(f)(1). The plaintiffs initially filed suit in this Court on January 19, 2011. Compl.

The plaintiffs' complaint asserts five claims for judicial review under the Medicare Act, 42 U.S.C. § 1395oo(f)(1): The plaintiffs first assert that the total outlier payments made to all hospitals for the periods at issue fell short of a minimum level required by the Medicare Act, so the plaintiff hospitals are now entitled to additional payments. See Compl. ¶¶ 3, 16–17, 24. Second, the plaintiffs argue that the fixed loss thresholds that the Secretary set for the periods in dispute were based on payment projections that failed to recognize and account for an apparent pattern of decline in hospital cost-to-charge ratios that was driven by a slowdown in the growth of hospital costs per discharge and changes in the relationship between hospitals' charges and their costs. See Compl. ¶ 24. Third, the plaintiffs claim that when using past hospital charge data to make projections of future outlier payments, the Secretary should have used a method that employed an inflation adjustment factor based on the observed rate of increase in hospitals' costs, instead of a method that employed an adjustment factor based on the observed rate of

---

[5] The defendant acknowledges that the plaintiffs filed appeals before the Provider Reimbursement Review Board but does not concede that all of the specific claims in the Complaint were timely and properly raised and exhausted in administrative proceedings.

increase in hospitals' charges. See Compl. ¶ 24 (asserting that "the Secretary failed to consider use of the 'cost methodology,' rather than the 'charge methodology,' in setting the outlier thresholds"). Fourth, the plaintiffs argue that the Secretary should have readjusted the fixed loss threshold in the middle of each year to bring total outlier payments closer to the minimum that the plaintiffs contend is required by the statute. See Compl. ¶ 24 (asserting that "the Secretary[] failed to require mid-year adjustments"). Finally, the plaintiffs' fifth claim is that the Secretary was required to make, and failed to make, unspecified adjustments to the procedures for reconciling Medicare claims. See Compl. ¶ 24 (asserting that the Secretary "failed to consider adjustments to the reconciliation process").

## ARGUMENT

**I.      The plaintiffs did not contend in administrative proceedings that the Secretary should have required midyear adjustments to outlier thresholds or made adjustments to the reconciliation process, so the Court lacks subject matter jurisdiction over any claims based on such arguments.**

This Court lacks subject matter jurisdiction over any claims regarding whether the Secretary should have made midyear adjustments to fixed loss thresholds or should have made adjustments to the reconciliation process. The plaintiffs never requested expedited judicial review of these claims before the Provider Reimbursement Review Board, and the Board did not grant expedited judicial review of these claims. Consequently, this Court cannot exercise judicial review over these claims under 42 U.S.C. § 1395oo(f)(1).

The party that seeks to invoke federal court jurisdiction—in this case, the plaintiffs—bears the burden of establishing subject matter jurisdiction. See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). When a defendant asserts that the allegations in the plaintiff's complaint are legally insufficient to invoke the court's jurisdiction, the court considers the same materials that it would consider on a motion to dismiss for failure to state a claim. See

Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C. Cir. 2002); Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992). This means that the Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007). This includes the plaintiffs' written requests seeking expedited judicial review under § 1395oo(f)(1)—one of these requests is attached to the plaintiffs' complaint, Compl. Ex. D, and the two other requests, which are attached to this motion as Exhibits 1 and 2, are referred to in the complaint and are integral to the plaintiffs' claims. See Compl. ¶ 22 (referring to requests for expedited judicial review); Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir. 2004) (holding that documents that were not attached to the complaint but were "referred to in the complaint and integral to" the plaintiff's claims could be considered on a motion to dismiss).

The Supreme Court and the D.C. Circuit have held that under 42 U.S.C. § 405(h), which is incorporated into the Medicare Act by 42 U.S.C. § 1395ii, the administrative and judicial review mechanisms provided by the Medicare Act are the exclusive means for bringing any claim based on the Medicare Act. See Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 13 (2000) (explaining that § 1395ii "demands the 'channeling' of virtually all legal attacks through the agency"); Am. Chiropractic Ass'n v. Leavitt, 431 F.3d 812, 816 (D.C. Cir. 2005). A federal district court generally cannot exercise jurisdiction over Medicare claims that the plaintiff did not pursue in administrative proceedings before the agency. See Ill. Council on Long Term Care, 529 U.S. at 13; Am. Chiropractic Ass'n, 431 F.3d at 816. Thus, this Court's review in this case is restricted to the specific issues that the plaintiffs presented to the Provider

Reimbursement Review Board and that the Board determined to be outside its authority and therefore eligible for expedited judicial review under 42 U.S.C. § 1395oo(f)(1). <u>See</u> 42 U.S.C. § 1395oo(f)(1). Any challenges that were not presented to or considered by the Provider Reimbursement Review Board are barred by § 405(h) and § 1395ii.

This means that the plaintiffs cannot raise new claims before this Court asserting that the Secretary was required to make midyear adjustments to the fixed loss threshold or was required to make adjustments to the procedures for reconciling Medicare claims. The requests for expedited judicial review that the plaintiffs submitted to the Provider Reimbursement Review Board raised only two issues: an argument that "the Secretary set the thresholds used to determine outlier payments too high" because of flaws in "the methodology used to project the outlier thresholds" and an argument that the Secretary "failed to pay out the total amount of the outlier pool created by a reduction in standardized payments." Compl. Ex. D at 2; Ex. 1 at 2; Ex. 2 at 2. The plaintiffs' requests for expedited judicial review did not assert that the Secretary was required to make midyear adjustments to the fixed loss thresholds, nor did they argue that the Secretary failed to make required adjustments to the process for reconciling Medicare claims. Because the plaintiffs did not request expedited judicial review on these issues, the Board did not make any determination of whether it had authority to decide those issues, and it did not authorize expedited judicial review on those issues. <u>See</u> Compl. Exs. A–C. Consequently, this Court lacks jurisdiction to consider these issues under § 1395oo(f)(1) or under any other statute. <u>See</u> 42 U.S.C. § 1395oo(f)(1) (authorizing judicial review only of claims that have been properly presented to the Provider Reimbursement Review Board); 42 C.F.R. § 405.1842 (regulations implementing 42 U.S.C. § 1395oo(f)(1)); <u>Ill. Council on Long Term Care</u>, 529 U.S. at 10 (noting that 42 U.S.C. § 405(h) and 42 U.S.C. § 1395ii generally preclude hearing Medicare-related

claims under the statute authorizing general federal question jurisdiction, 28 U.S.C. § 1331);

Action Alliance of Senior Citizens v. Leavitt, 483 F.3d 852, 858 (D.C. Cir. 2007) (explaining that

a plaintiff cannot circumvent the channeling requirement of 42 U.S.C. § 405(h) and 42 U.S.C.

§ 1395ii by bringing an action for mandamus under the Mandamus and Venue Act, 28 U.S.C.

§ 1361, because "the existence of an alternative remedy"—in this case, the judicial review

mechanism provided under the Medicare Act— "precludes mandamus").[6]

## II.      The plaintiffs' complaint fails to state a claim upon which relief can be granted.

The plaintiffs' complaint does not state any valid claims: The plaintiffs' assertion that the

Secretary was required to ensure that total outlier payments to all hospitals reached a certain

minimum level was rejected by the D.C. Circuit in County of Los Angeles v. Shalala, 192 F.3d

1005 (D.C. Cir. 1999). The plaintiffs' assertion that the Secretary was required to make midyear

adjustments to the fixed loss threshold fails for the same reason—the statute requires the

Secretary only to set the fixed loss threshold based on reasonable projections and does not

demand that actual outlier payments add up to any particular total. Finally, the plaintiffs'

assertion that the Secretary failed to consider key factors in making her payment projections is

belied by the Secretary's notices in the Federal Register explaining her methods.

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the

Federal Rules of Civil Procedure, the complaint must contain "more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do. Factual allegations

must be enough to raise a right to relief above the speculative level on the assumption that all the

---

[6] At this point, the Secretary seeks dismissal of only two aspects of the plaintiffs' claims on jurisdictional grounds. However, the Secretary does not concede that the plaintiffs' remaining claims were properly raised in administrative proceedings. The Secretary may seek dismissal of additional claims on similar grounds later in this litigation if this motion to dismiss is not granted.

allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550

U.S. 544, 555 (2007) (footnote omitted) (citations omitted); see also Kowal v. MCI Commc'ns

Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) ("[T]he court need not accept inferences drawn by

plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the

court accept legal conclusions cast in the form of factual allegations."); Rempfer v. Sharfstein,

583 F.3d 860, 865 (D.C. Cir. 2009) (noting that a claim that an agency action was arbitrary and

capricious can be resolved on a motion to dismiss). The rules of pleading require factual

allegations "plausibly suggesting," and "not merely consistent with," the elements of a valid

claim for relief. Bell Atl. Corp., 550 U.S. at 557. In evaluating the sufficiency of the complaint, a

court considers "the facts alleged in the complaint, any documents either attached to or

incorporated in the complaint and matters of which [the Court] may take judicial notice." EEOC

v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997); see also Tellabs, Inc. v.

Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007). That includes any notices issued by

the Secretary in the Federal Register. 44 U.S.C. § 1507 ("The contents of the Federal Register

shall be judicially noticed . . . .").

> **A.    The plaintiffs' argument that the Secretary made insufficient total outlier
> payments fails to state a claim because the D.C. Circuit has established that
> the statute does not require that outlier payments to all hospitals add up to
> any specific total.**

The Secretary is not required to make additional payments to the plaintiffs to make up for

differences between the Secretary's payment projections for the disputed periods and the actual

payments that the Secretary eventually made. The D.C. Circuit squarely held in County of Los

Angeles v. Shalala, 192 F.3d 1005 (D.C. Cir. 1999), that 42 U.S.C. § 1395ww(d)(5)(A) simply

requires the Secretary to set fixed loss thresholds based on advance projections of Medicare

payments and does not require the Secretary to readjust payments later to make up for differences between those projections and actual payments.

As explained above, see supra pp. 7–9, the Secretary sets the fixed loss threshold in advance of each fiscal year. The Secretary makes projections about the charges that hospitals will submit in the coming year and then adjusts the fixed loss threshold so that the outlier payments calculated from those projected charges will add up to an amount between 5 and 6 percent of DRG-related payments calculated from those projected charges. Because it is impossible to predict the actual pattern of hospital charges, the actual pattern of hospital charges inevitably differs from the Secretary's projections, and actual outlier payments may not end up falling between 5 and 6 percent of actual DRG-related payments.[7]

In County of Los Angeles v. Shalala, hospitals sought to compel the Secretary to readjust outlier payments to make up for differences between the Secretary's projections of total payments and the total actual payments ultimately made. The court rejected the plaintiffs' challenge, holding that the Secretary had properly interpreted § 1395ww(5)(A)(iv) as "speak[ing] only to how she is to calculate outlier thresholds for the forthcoming year," and not imposing any "obligation to ensure that actual outlier payments for the year total five percent of projected DRG-related payments." Cnty. of Los Angeles, 192 F.3d at 1013; see id. at 1020 (upholding the Secretary's interpretation). The D.C. Circuit found that requiring the Secretary to readjust outlier payments as the plaintiffs requested would inappropriately "transform the character of the

---

[7] In some fiscal years, outlier payments have amounted to less than 5 percent of DRG-related payments. See Compl. ¶ 16. In other years, outlier payments have amounted to more than 6 percent of DRG-related payments. See Medicare Program; Proposed Change in Methodology for Determining Payment for Extraordinarily High-Cost Cases (Cost Outliers) Under the Acute Care Hospital Inpatient Prospective Payment System, 68 Fed. Reg. 10,420, 10,423 (Mar. 5, 2003) (table indicating that outlier payments amounted to more than 6 percent of DRG-related payments in some years).

outlier-payment regime from a system intended to insulate hospitals from aberrational and extraordinary costs into nothing more than an entitlement program for Medicare providers." Id. at 1017–18. Thus, County of Los Angeles forecloses any claim that the Secretary must make additional outlier payments merely because projected total payments for the periods in dispute did not match up exactly with actual total payments.

Differences between the Secretary's projections and actual future outcomes also do not suggest that the Secretary used improper methods to make her payment projections. Differences, even large differences, between advance projections and actual future outcomes are inevitable, for "[p]rojections of any kind . . . are necessarily speculative, inexact, and riddled with uncertainty." North Carolina v. FERC, 112 F.3d 1175, 1190 (D.C. Cir. 1997). Anyway, the Court cannot consider future outcomes in evaluating the Secretary's actions. A court reviewing agency action must base its review on the information available to the agency at the time of the action and cannot set aside agency action based on knowledge of how things turned out after the agency acted. See Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 792 (D.C. Cir. 1984) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision.").

**B.     County of Los Angeles v. Shalala also forecloses any argument that the Secretary was required to readjust the fixed loss threshold in the middle of each year.**

County of Los Angeles v. Shalala also forecloses the plaintiffs' argument—not raised in administrative proceedings—that the Secretary was required to consider making midyear adjustments to the fixed loss threshold. The court in County of Los Angeles found that the Secretary correctly interpreted § 1395ww(d)(5)(A) as requiring that the Secretary set fixed loss thresholds "in advance of each fiscal year," County of Los Angeles, 192 F.3d at 1019, and not requiring that the Secretary take any corrective steps later to ensure that actual outlier payments

20

amount to between 5 and 6 percent of DRG-related payments, see id. at 1020. The court observed that implementing midyear adjustments would require "tremendous resources" and might have other undesirable side effects as well. Id. at 1019.

As for the plaintiffs' claim that the Secretary should have considered making unspecified adjustments to the reconciliation process, which the plaintiffs also failed to raise in administrative proceedings, to the extent the plaintiffs argue that the Secretary was required to make these adjustments to bring outlier payments closer to the target proportion of DRG-related payments, this claim is also foreclosed by County of Los Angeles.

> **C.    The Secretary's notices in the Federal Register adequately explained and justified the methods the Secretary used to make payment projections.**

Finally, the plaintiffs do not mount a valid challenge to the methods the Secretary used to make her payment projections. The Federal Register notices in which the Secretary explained her methodology are more than enough to establish that the Secretary considered relevant factors and used reasonable methods to make her payment projections. Congress did not spell out precise methods for the Secretary to use in making annual payment projections; instead, Congress relied on the Secretary to devise appropriate methods based on the expertise and accumulated experience of the Department of Health and Human Services. The D.C. Circuit has explained that a court should seldom interfere with an agency's expert judgments regarding matters of prediction and projection.

The plaintiffs' complaint raises two claims pertaining to the methods the Secretary used to make payment projections when she set the fixed loss thresholds for the periods in dispute: First, the plaintiffs argue that the Secretary should have set outlier thresholds lower to account for an apparent slowdown in the growth of hospital costs. See Compl. ¶ 24. Second, the plaintiffs claim that when making projections of future outlier payments based on actual historical hospital

charges, the Secretary erred by employing a "charge methodology" instead of employing a "cost methodology," as the Secretary had previously done for fiscal years 1994 to 2002. See Compl. ¶ 24. Neither of these claims is legally sufficient, because the Federal Register notices pertaining to the fixed loss thresholds for the periods in dispute reveal that the Secretary made reasonable choices after duly considering relevant factors.

The D.C. Circuit has repeatedly held that when a statute calls upon an agency to make predictions or projections of uncertain future events within the agency's areas of expertise, courts should generally defer to the agency's judgments about the precise methods for making those projections. As the D.C. Circuit explained in Rural Cellular Ass'n v. FCC, 588 F.3d 1095 (D.C. Cir. 2009):

> The "arbitrary and capricious" standard is particularly deferential in matters implicating predictive judgments . . . . In circumstances involving agency predictions of uncertain future events, "'complete factual support in the record for the [agency's] judgment or prediction is not possible or required'" since "'a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency.'" Thus, when an agency's decision is primarily predictive, our role is limited; we require only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive.

Id. at 1105 (citations omitted); see also Nat'l Wildlife Fed'n v. EPA, 286 F.3d 554, 565 (D.C. Cir. 2002) ("We may reject an agency's choice of a scientific model 'only when the model bears no rational relationship to the characteristics of the data to which it is applied.'") BNSF Ry. Co. v. Surface Transp. Bd., 526 F.3d 770, 781 (D.C. Cir. 2008) (rejecting complaints by shippers and railroads about a rate-setting board's methods for forecasting a hypothetical railroad's future operating expenses, stating, "[w]e decline to enter this hypertechnical fray"); In re Core Commc'ns, Inc., 455 F.3d 267, 282 (D.C. Cir. 2006) (rejecting challenges to FCC predictions about declining dialup Internet usage, noting that "[u]nder the arbitrary and capricious standard of review, an agency's predictive judgments about areas that are within the agency's field of

discretion and expertise are entitled to particularly deferential review, as long as they are reasonable" (alteration in original) (internal quotation marks omitted)); St. John's United Church of Christ v. FAA, 550 F.3d 1168, 1172 (D.C. Cir. 2008) (remarking that the FAA is entitled to deference when it acts based on forecasts of capacity and demand at an airport);

 The Secretary's detailed explanations of her predictive methods in the Federal Register are more than enough to establish that "the agency acknowledge[d] factual uncertainties and identif[ied] the considerations it found persuasive," Rural Cellular Ass'n, 588 F.3d at 1105, and that its methods bore a "rational relationship to the characteristics of the data to which it [was] applied," Nat'l Wildlife Fed'n, 286 F.3d at 565. The Federal Register notices announcing the fixed loss thresholds for the fiscal years in dispute explained the Secretary's reasons for not including an adjustment factor to account for a possible decline in hospitals' cost-to-charge ratios. The Federal Register notice pertaining to the fixed loss threshold for fiscal year 2004 noted that the simulations the Secretary conducted for the purpose of calculating the fiscal year 2004 fixed loss threshold would already capture recent changes in hospitals' cost-to-charge ratios because they employed more recent data than previous simulations. See Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates, 68 Fed. Reg. 45,345, 45,476 (Aug. 1, 2003) (explaining that "[a]fter the changes in policy enacted by the final outlier rule this year, it is necessary to calculate more recent cost-to-charge ratios," and noting that the Secretary therefore "calculated updated cost-to-charge ratios" using data from the most recent cost reporting year). The Secretary addressed the same issue again in the Federal Register notice related to the fixed loss threshold for fiscal year 2005:

> We do not believe that it is necessary to make a specific adjustment to our methodology for computing the outlier threshold to account for any decline in cost-to-charge ratios in FY 2005, as the commenter has requested. We have already taken into account the most significant factor in the decline in cost-to-

charge ratios, specifically, the change from using the most recent final settled cost report to the most recent tentatively settled cost report. Furthermore, we strongly prefer to employ actual data rather than projections in estimating the outlier threshold because we employ actual data in updating charges, themselves. However, we will continue to monitor the experience and evaluate whether further requirements to our methodology are warranted.

Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates, 69 Fed. Reg. 49,277–78 (Aug. 11, 2004). The Secretary addressed the issue again in the notice for fiscal year 2006, noting again that the use of very recent data in calculating the cost-to-charge ratios used in the simulations would help account for any pattern of decline in cost-to-charge ratios:

We also carefully analyzed the comments suggesting that we also adjust the cost-to-charge ratios that are used in setting the outlier thresholds. . . .

[T]he cost-to-charge ratios from the March 2005 Provider-Specific File reflect much more recent hospital-specific data . . . . The March 2005 Provider-Specific File includes the cost-to-charge ratios from hospitals' most recent tentatively settled cost report. In many cases, for part of FY 2006, fiscal intermediaries will determine actual outlier payment amounts using the same cost-to-charge ratios that are in the March 2005 Provider-Specific File. Fiscal intermediaries will begin using an updated cost-to-charge ratio to calculate the outlier payments for a hospital only after a more recent cost report of the hospital has been tentatively settled. We note that the cost-to-charge ratios that we are using from the March 2005 Provider-Specific File are approximately 3 percent lower on average than the cost-to-charge ratios from the December 2004 Provider-Specific File that we used in setting the proposed rule outlier threshold.

Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006 Rates; 70 Fed. Reg. 47,277, 47,495 (Aug. 12, 2005). These notices refute any suggestion that the Secretary simply failed to recognize the possibility of a pattern of decline in cost-to-charge ratios when she made her payment projections for the fiscal years in dispute.

Even if there had been some measures that the Secretary could have taken to more fully account for a possible pattern of decline in cost-to-charge ratios, failure to take those steps would not render the Secretary's predictive methods unreasonable. When an administrative agency

chooses a model for predicting future events, it is not required to account for every conceivable factor or variable in its analysis. Rather, the arbitrary-and-capricious standard of review only demands that the agency employ predictive methods bearing a "rational relationship to the characteristics of the data to which it is applied," Nat'l Wildlife Fed'n, 286 F.3d at 565. An agency has discretion to omit factors from its analysis to advance interests such as simplicity, workability, and cost-effectiveness. See, e.g., West Virginia v. EPA, 362 F.3d 861, 871 (D.C. Cir. 2004) ("[W]e will give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise. Furthermore, we must defer to the agency's decision on how to balance the cost and complexity of a more elaborate model against the oversimplification of a simpler model. We will reverse only if the model is so oversimplified that the agency's conclusions from it are unreasonable." (citations omitted) (internal quotation marks omitted)); Milk Train, Inc. v. Veneman, 310 F.3d 747, 754 (D.C. Cir. 2002) ("An agency 'typically has wide latitude in determining the extent of data-gathering necessary to solve a problem.'" (quoting Allied Local & Reg'l Mfrs. Caucus v. U.S. EPA, 215 F.3d 61, 71 (D.C. Cir. 2000))).

The Secretary's Federal Register notices for the disputed fiscal years (fiscal year 2004 to fiscal year 2006) also explained why the Secretary, when she made projections of future hospital charges, chose to employ a "charge methodology" instead of a "cost methodology" more similar to the methodology the Secretary used from fiscal year 1994 to fiscal year 2002. The terms "cost methodology" and "charge methodology" are shorthand for two alternative approaches to the task of transforming actual historical hospital charges into projections of future outlier payments. Under the "charge methodology" that the Secretary used during the fiscal years in dispute, the Secretary first transformed past charges into projected future charges by multiplying the past

charges by an inflation factor calculated from recent year-to-year changes in hospital charges. The Secretary would then transform these projected future charges into projections of hospitals' future estimated costs by multiplying the projected future charges by individual hospitals' cost-to-charge ratios. The Secretary would then calculate simulated outlier payments corresponding to the hospitals' projected estimated costs. See 70 Fed. Reg. at 47,495 (contrasting the "charge inflation methodology" used for fiscal year 2006 with the "cost inflation methodology . . . employed from FY 1994 to FY 2002"); Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1994 Rates, 58 Fed. Reg. 46,269, 46,347 (Sept. 1, 1993) (explaining the Secretary's use of a "cost inflation factor rather than a charge inflation factor" for fiscal year 1994).

       The "cost methodology," which the Secretary used from fiscal year 1994 to 2002, and which the plaintiffs say the Secretary should have used in the disputed fiscal years, took a different route to the same destination. Like the charge methodology, the cost methodology started with past hospital charges and transformed those past charges into projected estimated costs, then calculated simulated outlier payments based on those projected estimated costs. The difference was that under the cost methodology, the transformation of charges into estimated costs took place before, instead of after, the transformation of past data into future projections. So under the cost methodology, the Secretary would first multiply past hospital charges by cost-to-charge ratios to produce past estimated costs. The Secretary would then multiply these past estimated costs by an inflation factor to arrive at projections of future estimated costs. The inflation factor was calculated from recent year-to-year changes in hospitals' costs, not from year-to-year changes in hospital charges. The Secretary would then calculate simulated outlier payments from the projected estimated costs. See 70 Fed. Reg. at 47,495; 58 Fed. Reg. at 46,347.

The Secretary's Federal Register notices fully explained why she used a "charge methodology" rather than a "cost methodology" to make her projections for the fiscal years in dispute. The Secretary began using the charge methodology in fiscal year 2003. The Federal Register notice for fiscal year 2003 explained that the Secretary decided to use an adjustment factor based on increases in charges because in recent years, "charges [had] been growing at a much faster rate than recent estimates of cost growth." Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2003 Rates, 67 Fed. Reg. 49,981, 50,124 (Aug. 1, 2002). Because the statute, 42 U.S.C. § 1395ww(d)(5)(A)(ii), specifies that a hospital's charges are the starting point for calculating its outlier payments, see supra pp. 5–7, this means that a method that employed an inflation adjustment factor based on recent observed increases in costs—like the cost methodology—would likely produce projections that were too low if charges were increasing faster than costs. See id. at 50,124. The Federal Register notice for fiscal year 2004 explained that the Secretary was continuing to use the same inflation-adjustment method she had used for fiscal year 2003 for the reasons that she had explained earlier. See 68 Fed. Reg. at 45,476 (stating that "[a]s discussed in the August 1, 2002 IPPS final rule," the Secretary was "continuing to use the 2-year average annual rate of change in charges per case" instead of "the rate-of-cost increase"). In the Federal Register notice for the following year, fiscal year 2005, the Secretary explained that while "charges [had] increased at a slower rate since the June 9, 2003 outlier final rule," it was still appropriate to use an adjustment factor based on observed increases in charges because "the basic tendency of charges to increase faster than costs [was] still evident." 69 Fed. Reg. at 49,277. And in the Federal Register notice for fiscal year 2006, the Secretary noted that the agency continued to believe that the charge methodology was preferable because it entailed using more recent cost-to-charge ratios and

would therefore be less likely to introduce errors related to using more outdated cost-to-charge ratios. 70 Fed. Reg. at 47,495; see also Compl. ¶ 24 (stating that changes in cost-to-charge ratios are relevant because cost-to-charge ratios "play a significant part in the calculation of outlier payments"). In addition, the Secretary noted that the charge methodology "more closely capture[d] how actual outlier payment amounts are calculated," since hospitals' charges are the starting point for calculating actual outlier payments. 70 Fed. Reg. at 47,495.

Both the charge methodology and the cost methodology are reasonable methods of accomplishing the task of producing projections of future outlier payments from actual historical hospital charges. Either method bears a "rational relationship to the characteristics of the data to which it is applied," Nat'l Wildlife Fed'n, 286 F.3d at 565, and the Secretary's explanations in Federal Register show a "rational connection between the facts found and the choice made," Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). The Secretary's election of the charge methodology over the cost methodology in the years in dispute was reasonable based on the Secretary's observations regarding how charges were increasing at a faster rate than costs.

The plaintiffs' complaint asserts that the Secretary was required to use the cost methodology because the "cost methodology had been more accurate in predicting outlier payments" in years prior to the disputed fiscal years. Compl. ¶ 24. But a model that appears to generate more accurate projections when applied to historical data will not necessarily generate more accurate projections when applied to future data. One model may match past data more closely than another model simply by chance, not because it better reflects the real-world phenomena that the model is intended to predict. Moreover, changes in the phenomena being modeled can affect the relative performance of different predictive methods. The projections the

plaintiffs are disputing in this case were made shortly after the Secretary made major changes in the procedures for calculating outlier payments, see supra p. 12, and at that time, no one knew for certain how the changes would interact with changing conditions in the health care industry or how they would ultimately affect hospitals' charges and the levels of outlier payments. See, e.g., Oceana, Inc. v. Gutierrez, 488 F.3d 1020, 1025 (D.C. Cir. 2007) (deferring to the agency's judgment when the agency made a "prediction resting on the agency's evaluation of past performance and its expert judgment about how the measures it implemented will operate in the future").

More fundamentally, even if the cost methodology were inherently more accurate, that would not render the charge methodology arbitrary or capricious. The arbitrary-or-capricious standard of review does not require an agency to produce the most accurate projections possible. As explained above, an agency has discretion to choose among reasonable means of achieving its ends; an agency is required to use reasonable methods, not the "best" method. See North Carolina v. FERC, 112 F.3d 1175, 1190 (D.C. Cir. 1997) (stating that although estimates that the agency used to select growth rates might have been less reasonable than other available data, "the fact that these estimates were less 'reasonable' does not necessarily make them unreasonable or arbitrary"); Petal Gas Storage, L.L.C. v. FERC, 496 F.3d 695, 703 (D.C. Cir. 2007) (noting that under the arbitrary-and-capricious standard, the agency was "not required to choose the best solution, only a reasonable one"); Deaf Smith Cnty. Grain Processors, Inc. v. Glickman, 162 F.3d 1206, 1215 (D.C. Cir. 1998) (noting that the arbitrary-and-capricious standard demands a reasonable decision, not the best or most reasonable decision). The plaintiffs' belated judgments about what the "best" methods would have been, made with the benefit of hindsight, have no bearing on the question before the Court. See Walter O. Boswell Mem'l Hosp. v. Heckler, 749

F.2d 788, 792 (D.C. Cir. 1984) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision.").

The plaintiffs also complain that "the Secretary adopted, for subsequent years, some modifications providers previously had suggested." Compl. ¶ 3. This challenge, too, misunderstands the applicable standard of review. The fact that an agency changes its policies in light of subsequent experience does not render its earlier policies unlawful, even when the new policies incorporate features that were pressed on the agency earlier. See, e.g., Alvin Lou Media, Inc. v. FCC, 571 F.3d 1, 12 (D.C. Cir. 2009) ("That the [FCC] may have garnered experience over the years to bring its view closer to [the plaintiff's] position . . . is of no moment.").

The Secretary advanced reasonable explanations for the methods she used in making payment projections for the disputed fiscal years. The Secretary's actions cannot be considered arbitrary or capricious, and the plaintiffs' complaint fails to state a claim.

## CONCLUSION

Because the plaintiffs did not raise claims related to midyear adjustments or the claims reconciliation process in proceedings before the Provider Reimbursement Review Board, this Court lacks jurisdiction to hear those claims.

The plaintiffs' claim that the Secretary was required to ensure that total outlier payments to all hospitals met a required minimum level of 5 percent of DRG-related payments is foreclosed by County of Los Angeles v. Shalala, 192 F.3d 1005 (D.C. Cir. 1999). Finally, the plaintiffs fail to allege facts that could support a claim that the Secretary's methods for making payment projections were arbitrary or capricious.

Date: March 25, 2011                                   Respectfully submitted,

                                                      TONY WEST
                                                      Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney

SHEILA M. LIEBER
Deputy Director

/s/ JAMES C. LUH
JAMES C. LUH
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave NW
Washington DC 20530
Tel: (202) 514-4938
Fax: (202) 616-8460
E-mail: James.Luh@usdoj.gov
Attorneys for Defendant