# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                                                                                          |   |                                |
|------------------------------------------------------------------------------------------|---|--------------------------------|
| DISTRICT HOSPITAL PARTNERS, L.P.,<br>d/b/a The George Washington University<br>Hospital, et al. | ) |                                |
|                                                                                          | ) |                                |
| Plaintiffs,                                                                              | ) |                                |
|                                                                                          | ) |                                |
| v.                                                                                       | ) | Civil Action No. 11-0116 (ESH) |
|                                                                                          | ) |                                |
| KATHLEEN SEBELIUS,<br>Secretary, Department of Health and<br>Human Services              | ) |                                |
|                                                                                          | ) |                                |
| Defendant.                                                                               | ) |                                |

## MEMORANDUM OPINION

Plaintiffs own and operate 186 hospitals that participate in the Medicare program. They have sued the Secretary of the Department of Health and Human Services ("Secretary") in her official capacity, alleging that her methodology for setting fixed loss thresholds for outlier payments to their hospitals, under the Medicare Act, 42 U.S.C. § 1395 *et seq.*, was arbitrary and capricious for the Inpatient Prospective Payment System ("IPPS") rules for federal fiscal years ("FFYs") 2004, 2005, and 2006. The factual and procedural history of this case has been set forth in this Court's earlier Memorandum Opinions.[1]

Now before the Court are the parties' cross-motions for summary judgment.[2] Plaintiffs challenge the Secretary's methodology for calculating the fixed loss threshold determinations for

---

[1]  *See* Mem. Op., July 5, 2011 [Dkt. No. 14] at 1, 6-7; Mem. Op. and Order, Sept. 10, 2013 [Dkt. No. 111] at 2-5; Mem. Op. and Order, Sept. 19, 2013 [Dkt. No. 112].

[2]  *See* Def.'s Mem. of P. & A. in Support of Mot. for Summ. J. ("Def.'s Mot."), April 15, 2013 [Dkt. No. 91-1]; Pls.' Mem. of P. & A. in Opp'n to Def.'s Mot. for Summ. J and in Support of Pls.' Cross-Mot. for Summ. J. (Pls.' Mot.), May 17, 2013 [Dkt. No. 95]; Def.'s Reply Mem. in Support of Mot. for Summ. J. and Mem. of P. & A. in Opp'n to Pls.' Cross Mot. for Summ. J. ("Def.'s Reply"), June 20,

FFYs 2004-2006, claiming that she used historical charge inflation data and cost-to-charge ratios that failed to account for the June 9, 2003 Outlier Correction Rule and thereby resulted in underpayments to participating hospitals. Having considered the administrative record and the parties' briefings, the Court concludes that the Secretary made reasonable methodological choices in determining the fixed loss thresholds for FFYs 2004-2006. Accordingly, the Court will grant the Secretary's motion for summary judgment and deny plaintiffs' motion.

## ANALYSIS

**I.    LEGAL STANDARDS**

**A.    MEDICARE**

Medicare is a federally funded system of health insurance for the aged and disabled. It is administered by Centers for Medicare and Medicaid Services ("CMS") under the direction of the Secretary. 42 U.S.C. § 1395kk; 42 C.F.R. § 400.200 *et seq.* When Medicare providers treat the program's beneficiaries, they receive coinsurance and deductible payments from the patient and then seek reimbursement for remaining costs from the Medicare program. *Foothill Hosp.— Morris L. Johnston Mem'l v. Leavitt,* 558 F. Supp. 2d 1, 2 (D.D.C. 2008).

Rather than pay hospitals for the specific cost of treating each Medicare patient, Medicare uses a "Prospective Payment System" ("PPS"), which compensates them at a fixed "federal rate" that is based on the "average operating costs of inpatient hospital services." *Cnty. of Los Angeles v. Shalala,* 192 F.3d 1005, 1008 (D.C. Cir. 1999). Because Medicare payments are standardized in this way, hospitals may be over- or under-compensated for any given procedure. The

2013 [Dkt. No. 101]; Pls.' Reply Mem. in Support of Pls.' Cross-Mot. for Summ. J. ("Pls.' Reply"), July 24, 2013 [Dkt. No. 105]; Pls.' Suppl. Mem. of P. & A. in Opp'n to Def.'s Mot. for Summ. J. and in Support of Pls.' Cross-Mot. for Summ. J. ("Pls.' Suppl. Mem."), Oct. 17, 2013 [Dkt. No. 119]; Def.'s Suppl. Mem. on Parties' Cross-Mots. for Summ. J. ("Def.'s Suppl. Mem."), Oct. 31, 2013 [Dkt. No. 121]; Pl.'s Reply to Def.'s Suppl. Mem. on Parties' Cross-Mot. for Summ. J. ("Pls.' Suppl. Reply"), Nov. 8, 2013 [Dkt. No. 123].

Secretary therefore provides hospitals with additional "outlier payments" to compensate for patients "whose hospitalization would be extraordinarily costly or lengthy." *Id.* at 1009. This case is about the Secretary's setting of thresholds that determine these outlier payments.

The Secretary enters into contracts with private firms to "review provider reimbursement claims and determine the amount due." *Catholic Health Initiatives v. Sebelius,* 617 F.3d 490, 491 (D.C. Cir. 2010). These "fiscal intermediaries" determine the outlier payments awarded to the hospitals. *See id.* & n. 1. Outlier payments are intended to "approximate the marginal cost of care beyond certain thresholds." *Lenox Hill Hosp. v. Shalala,* 131 F. Supp. 2d 136, 138 (D.D.C. 2000) (internal quotation marks omitted). The Medicare statute provides that

> (ii) . . . [A hospital paid under the PPS] may request additional payments in any case where charges, adjusted to cost . . . exceed the sum of the applicable DRG[3] prospective payment rate plus any amounts payable under subparagraphs (B) and (F) plus a fixed dollar amount determined by the Secretary.

> (iii) The amount of such additional payment . . . shall be determined by the Secretary and shall . . . approximate the marginal cost of care beyond the cutoff point applicable. . . .

42 U.S.C. § 1395ww(d)(5)(A). The phrase "charges, adjusted to cost" refers to the Secretary's duty to "estimate a hospital's costs based on the charges the hospital has billed for covered services in the case." (Def.'s Mot. at 3.) Cost is estimated by multiplying the amount that the hospital charges by a "cost-to-charge ratio," which is a number that represents a "hospital's average markup." *Appalachian Reg'l Healthcare, Inc. v. Shalala,* 131 F.3d 1050, 1052 (D.C. Cir. 1997). The estimate of the hospital's costs in a given case is then compared to the sum of

---

[3] "DRG" stands for "diagnosis related group." There are 470 DRGs, each of which is intended to cover a medical condition. *Cnty. of Los Angeles,* 192 F.3d at 1008. The "DRG prospective payment rate" is the standardized rate paid by the Secretary to a hospital after it has been adjusted for various factors, including the "wage index" and the "weight assigned to the patient's DRG." *Id.* at 1009.

two other factors (the "outlier threshold").[4]  42 U.S.C. § 1395ww(d)(5)(A)(ii).  If the estimate of the costs is greater than the outlier threshold, the hospital is eligible for an outlier payment.  *See id.*

The amount of the outlier payment is proportional to the amount by which the hospital's loss exceeds the outlier threshold.  Currently, hospitals are entitled to reimbursement of eighty percent of costs above the outlier threshold.  42 C.F.R. § 412.84(k).  Thus, if the outlier threshold is $20,000 and a hospital's cost estimate is $80,000, the hospital will be entitled to eighty percent of $60,000 (the difference between the costs and the outlier threshold).

The outlier threshold represents the sum of two amounts:  the DRG prospective payment rate and the fixed loss threshold.  Only the fixed loss threshold is at issue in this case.  In calculating the fixed loss threshold, the Secretary applies section 1395ww(d)(5)(A)(iv), which requires the "total amount of the additional" outlier payments to be not "less than 5 percent nor more than 6 percent" of the total payments "projected or estimated to be made based on DRG prospective payment rates for discharges in that year."  *See Cnty. of Los Angeles,* 192 F.3d at 1013.  The Secretary has interpreted this provision to require her to "select outlier thresholds which, when tested against historical data, will likely produce aggregate outlier payments totaling between five and six percent of projected or estimated DRG-related payments."  *Id.*  She has also interpreted the provision to mean that "she has no obligation to ensure that actual outlier payments for the year total five percent of projected DRG-related payments."  *Id.*

The Secretary sets a fixed loss threshold for each FFY as part of massive annual IPPS rulemakings that often span over four hundred pages in the Federal Register.  For the three rulemakings at issue in this case, the Secretary calculated the fixed loss threshold as follows.

---

[4] Several other factors may affect the calculation of the outlier threshold but, as they are not at issue in this case, they are omitted from this discussion.  (*See* Def.'s Mot. at 4 n.4.)

First, the Secretary adjusted historical charge data using an inflation factor (also based on historical data) to approximate hospitals charges in the upcoming FFY. Next, the Secretary multiplied the inflation-adjusted charge universe by hospital-specific cost-to-charge ratios, thereby projecting hospital costs for each case in the model. Third, the Secretary, after making other adjustments not relevant to this case, modeled the effect different fixed loss thresholds would have on outlier payments. (*See* Def.'s Mot. at 7; Pls.' Mot. at 17-18.) Finally, the Secretary selected a fixed loss threshold that she projected would satisfy the statutory target under section 1395ww(d)(5)(A)(iv).

The Secretary's methodology reveals three relevant arithmetic axioms. First, all things being equal, a higher charge inflation factor will result in a higher fixed loss threshold. Second, all things being equal, higher cost-to-charge ratios will result in a higher fixed loss threshold. And finally, again all things being equal, a higher fixed loss threshold will result in a higher outlier threshold and thus lower outlier payments to participating hospitals. (Pls.' Mot. at 18.)

B.     JUDICIAL REVIEW

Judicial review of plaintiffs' claims under the Medicare Act rests on 42 U.S.C. § 1395oo(f)(1), which incorporates the Administrative Procedure Act ("APA"). *See* 42 U.S.C. § 1395oo(f)(1) ("Such action[s] . . . shall be tried pursuant to the applicable provisions under chapter 7 of Title 5."). The Court accordingly reviews the Secretary's actions under the APA, "pursuant to which [it] will uphold them unless they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 916-17 (D.C. Cir. 2009) (quoting 5 U.S.C. § 706(2)(A)); *see also St. Elizabeth's Med. Ctr. of Boston, Inc. v. Thompson*, 396 F.3d 1228, 1233 (D.C. Cir. 2005) ("[J]udicial review of HHS reimbursement decisions shall be made under APA standards"). "An agency decision is arbitrary

and capricious if it 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Cablevision Sys. Corp. v. F.C.C.*, 649 F.3d 695, 714 (D.C. Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Court's inquiry must focus on the "reasonableness of the agency's decisionmaking process," and the Court "will not substitute [its] judgment for that of the agency." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009). The Court has a "limited" role and its review is "particularly deferential" where the agency's decision is "primarily predictive." *Id.* Thus, the Court will "'defer to the agency's decision on how to balance the cost and complexity of a more elaborate model against the oversimplification of a simpler model,'" *West Virginia v. E.P.A.*, 362 F.3d 861, 868 (D.C. Cir. 2004) (quoting *Small Refiner Lead Phase-Down Task Force v. E.P.A.*, 705 F.2d 506, 535 (D.C. Cir. 1983), and "require[s] only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive."[5] *Rural Cellular Ass'n*, 588 F.3d at 1105. With these principles in mind, the Court will now address each of plaintiffs' challenges to the fixed loss threshold determinations.[6]

---

[5] Plaintiffs argue that the Secretary is not owed deference in this case due to "procedural defect[s]," including, *inter alia*, her alleged "failure to use the best available data," "failure to provide reasoned explanations justifying certain actions," and "fail[ure] to consider an important factor that, if considered properly, would have formed the basis for a different policy." (*See* Pls.' Mot. at 30.) In so arguing, plaintiffs misapprehend the standard of review. While procedural irregularities certainly could render even predictive decisions arbitrary and capricious, the standard remains "particularly deferential," regardless of whether the Court ultimately defers to the Secretary's determination.

[6] Before turning to the merits, the Court will address plaintiffs' renewal of "their request to have the Scully Testimony included in the [administrative] records." (Pls.' Suppl. Mem. at 9-10 n.4.) The Court previously rejected plaintiffs' motion to compel the inclusion of the Scully Testimony in the administrative records of this case (9/19/13 Mem. Op. at 22-24 & n.14) and interprets plaintiff's attempt to "renew their request" as a motion for reconsideration under Fed. R. Civ. P. 54(b). While relief is

## II. FFY 2004 FIXED LOSS THRESHOLD DETERMINATION

In the FFY 2004 IPPS Rule, the Secretary established a fixed loss threshold of $31,000.

S*ee Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates* ("FFY 2004 IPPS Rule"), 68 Fed. Reg. 45346, 45476-78 (Aug. 1, 2003). Although the Secretary had proposed a $50,645 fixed loss threshold for FFY 2004, *id.* at 45476, she "lowered the [final] outlier threshold in response to the new provisions on outliers" promulgated two months earlier in the June 9, 2003 Outlier Correction Rule. *See id.* at 45478; *see also id.* at 45477.

The Secretary calculated the charge inflation factor for the FFY 2004 fixed loss threshold by utilizing "the 2-year average annual rate of change in charges per case," the same method she had used for FFY 2003. *Id.* at 45476. For FFY 2004, the Secretary calculated the rate of change using charge data from FFY 2000 to 2001 and FFY 2001 to 2002. *Id.*

In contrast, the Secretary adopted a new method for calculating cost-to-charge ratios. *Id.* The Secretary explained: "[a]fter the changes in policy enacted by the final [Outlier Correction Rule] this year, it is necessary to calculate more recent cost-to-charge ratios because fiscal intermediaries will now use the latest tentatively settled cost report instead of the latest settled

---

available under Rule 54(b) within the discretion of the court "as justice requires," *see Cobell v. Norton,* 355 F. Supp. 2d 531, 539 (D.D.C. 2005), generally "a court will grant [the] motion . . . only when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order." *Zeigler v. Potter,* 555 F. Supp. 2d 126, 129 (D.D.C. 2008) (internal quotation marks omitted). Here, plaintiff argues the Court erred in concluding that the relevant portions of the Scully Testimony were Administrator Scully's personal opinions, rather than the official position of CMS. In support of this position, plaintiffs attach a declaration from Administrator Scully stating that his relevant testimony "did not represent any of [his] personal views." (Pls.' Suppl. Mem. at 9-10 n.4). Even considering the newly produced declaration, the Court is unpersuaded that the relevant portions of the Scully Testimony represent anything other than Administrator Scully's "personal opinion." (*See* 9/19/13 Mem. Op. at 23 (quoting Scully Testimony at 13 ("And so *I do think* the outlier threshold – *my personal opinion* is that it probably, if we fix the abuses, would be too high . . . ." (emphasis added))).) In any event, the new declaration from Administrator Scully does not represent an intervening change in law or new evidence previously unavailable, or otherwise demonstrate that the Court clearly erred in denying plaintiffs' initial motion to compel. Accordingly, the Court will deny plaintiffs' renewed motion to compel.

cost report to determine a hospital's cost-to-charge ratio." *Id.* As a result, the Secretary

"approximated the latest tentatively settled cost reports" by

> match[ing] charges-per-case to costs-per-case from the most recent cost reporting
> year; . . . then divid[ing] each hospital's costs by its charges to calculate the cost-
> to-charge ratio for each hospital; and . . . [then] multipl[ying] charges from each
> case in the FY 2002 MedPAR (inflated to FY 2004) by this cost-to-charge ratio to
> calculate the cost per case.

*Id.*

Plaintiffs challenge the Secretary's methodologies for calculating the charge inflation

factor and the cost-to-charge ratios.[7] As plaintiffs explain, their "chief concern is that the

Secretary's *projected* hospital costs were too high because the Secretary used *unreasonably high*

*inflation factors and [cost-to-charge ratios]*." (Pls.' Reply at 7.) Plaintiffs continue, "[b]ecause

the *projected* hospital costs were unrealistically high, the difference between the *projected*

hospital costs and the *projected* IPPS payment was higher than it should have been" (*id.*) and

"caused the outlier underpayments at issue." (*Id.* at 8.)[8]

---

[7] A central tenet of administrative law requires that "issues not raised in comments before the agency" during a given rulemaking "are waived" for purposes of challenging the reasonableness of that rulemaking in court. *See Nat'l Wildlife Fed'n v. E.P.A.*, 286 F.3d 554, 562 (D.C. Cir. 2002). The Secretary is not asserting this defense with regard to the FFY 2004 IPPS Rule because at least one public comment she received during that rulemaking "has been lost and is not included in the administrative record for that determination." (Def.'s Mot. at 23-24.) The Secretary does, however, assert this defense as to the FFYs 2005 and 2006 IPPS Rules. (*Id.* at 23.)

[8] Although plaintiffs make much of the fact that the fixed loss thresholds for FFYs 2004-2006 resulted in payments that ultimately undershot the statutory target in section 1395ww(d)(5)(A)(iv) (*see* Pls.' Mot. at 20-21; Pls.' Reply at 1), plaintiffs' "results-oriented" approach has been rejected in the face of the Secretary's consistent interpretation that the statute prescribes a "prospective-only policy" that the Secretary project fixed loss thresholds with the statutory target in mind. *See Cnty. of Los Angeles*, 192 F.3d at 1018-20. Thus, it is irrelevant that the fixed loss thresholds established for FFYs 2004-2006 actually resulted in underpayments. The relevant question is only whether the predictive methodologies used to set those thresholds were arbitrary and capricious as judged by the record before the Secretary at the time each threshold was set. *Cf. Am. Mining Cong. v. E.P.A.*, 907 F.2d 1179, 1190 (D.C. Cir. 1990) (holding that post-1980 data is irrelevant to review of an "agency's determination, based on 1980 data, that spent potliners are hazardous wastes.")

A.    CHARGE INFLATION FACTOR

Plaintiffs first argue that the Secretary's calculation of the charge inflation factor using historical data from FFYs 2000-2002 was arbitrary and capricious because the data were from the "turbo-charging"[9] era when charge inflation was rampant and therefore failed to account for predictable decreases in charge inflation following the promulgation of the Outlier Correction Rule.  (*See* Pls.' Mot. at 33.)  As a result, plaintiffs continue, the Secretary overinflated the historical charge data when projecting FFY 2004 charges, resulting in an excessively high fixed loss threshold determination.  (*Id.* at 34.)

In support of their argument, plaintiffs point first to the Outlier Correction Interim Final Rule ("IFR").  In the IFR, the Secretary considered a mid-year reduction in the FFY 2003 fixed loss threshold to account for contemplated changes in outlier policy meant to eradicate turbo charging.  (*See* FFY 2004 AR at 2242-43.)  To calculate a charge inflation factor for the proposed mid-year fixed loss threshold reduction, the Secretary excluded data from 123 of the worst turbo-charging hospitals for which she "could not reliably predict the . . . cost-to-charge ratios."  (*See id.* at 2277, 2279.)  However, by the time she issued her Proposed Outlier Correction Rule, the Secretary had decided against any mid-year fixed loss threshold reduction because of "extreme uncertainty regarding the effects of aggressive hospital charging practices." *See Medicare Program; Proposed Change in Methodology for Determining Payment for Extraordinarily High-Cost Cases (Cost Outliers) Under the Acute Care Hospital Inpatient Prospective Payment System*, 68 Fed. Reg. 10420, 10426-27 (March 5, 2003).  Likewise, in the

---

[9] "Turbo-charging" refers to "abusive, excessive charging practices" (Def.'s Mot. at 10) in which "rapid increases in charges by certain hospitals . . . resulted in their cost-to-charge ratios being set too high" and caused "excessive outlier payments to these hospitals."  *Medicare Program; Change in Methodology for Determining Payment for Extraordinarily High-Cost Cases (Cost Outliers) Under the Acute Care Hospital Inpatient and Long-Term Care Hospital Prospective Payment Systems* ("Outlier Correction Rule"), 68 Fed. Reg. 34494, 34496 (June 9, 2003).

Final Outlier Correction Rule, the Secretary found, based on her analysis of more recent data, that it was appropriate "not to change the FY 2003 outlier threshold" at that time. *Outlier Correction Rule*, 68 Fed. Reg. at 34506.

Because the Secretary decided against making a mid-year adjustment to the FFY 2003 fixed loss threshold in the Outlier Correction Rule, her consideration in the IFR of excluding data from the 123 worst turbo-charging hospitals when adjusting the threshold was not addressed in either the Proposed or Final Outlier Correction Rules. Plaintiffs now argue that the Secretary acted arbitrarily and capriciously during the *subsequent* FFY 2004 IPPS Rulemaking by failing to adopt what she had considered doing in the IFR – *i.e.*, excluding data from these 123 hospitals when calculating the charge inflation factor. This argument comprises several sub-arguments.

Plaintiffs first argue the Secretary's abandonment, "without explanation," of the IFR's exclusion of data from the 123 turbo-charging hospitals, is itself arbitrary and capricious. (Pls.' Mot. at 33; *cf.* Pls.' Suppl. Mem. at 6-8.) However, this is not a case where the Secretary "rescinded a policy or reversed course without explaining why [she] did not take a more limited action." *See Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 216-17 (collecting cases); *cf. Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42 ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."). Instead, this is a case where a particular methodology considered when drafting an interim version of a rule, but never adopted formally, even in a proposed rule, was tacitly rejected in favor of continued practice of including data from all hospitals when calculating the charge inflation factor. "[U]p to the point of announcement, agency decisions are freely changeable, as are the bases of those decisions." *PLMRS Narrowband Corp. v. F.C.C.*, 182 F.3d 995, 1001-02 (D.C. Cir. 1999) (quoting

*Checkosky v. S.E.C.*, 23 F.3d 452, 489 (D.C. Cir. 1994)); *cf. Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1208-09 (D.C. Cir. 1996) (holding final regulation that was withdrawn after being signed, but before being filed for public inspection, was never a binding rule or regulation requiring repeal or modification, and rejecting plaintiff's view that "whenever agencies propose rules, receive comments from the public, and internally approve a draft version of the final regulations, the APA would prevent agencies from discarding those documents without again requesting public comment").  Thus, because the IFR's exclusion of data from 123 turbo-charging hospitals never represented agency policy, the Secretary was under no duty to explain why she chose to follow her prior practice and not adopt that new methodology during the later FFY 2004 IPPS Rulemaking.

Plaintiffs relatedly argue that, even if the Secretary were not obligated to explain why she did not adopt the methodologies considered in the IFR, she was obligated to explain why she included the charge data for the 123 turbo-charging hospitals when calculating the FFY 2004 outlier threshold.  (*See* Pls.' Mot. at 36-37; Pls.' Suppl. Mem. at 6-8.)[10]  While the Secretary "must consider reasonably obvious alternative[s] . . . and explain its reasons for rejecting alternatives in sufficient detail to permit judicial review," *see Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 797 (D.C. Cir. 1984) (internal quotation marks omitted), the Secretary's

---

[10] Plaintiffs also suggested that the Secretary acted arbitrarily and capriciously by "not explaining why she found in the IFR that the data from 123 high charging hospitals was so distorted . . . that it had to be excluded" but in the FFY 2004 IPPS rulemaking "only identified 50 such hospitals that required special treatment" – *i.e.*, reconciliation.  (*See* Pls.' Mot. at 37; *id.* at 41-42.)  However, as the Secretary explains, the IFR and the FFY 2004 IPPS Rule's reconciliation provision "were simply discussing different analyses of different subjects; there is no reason the count of 123 hospitals and the count of 50 hospitals should have matched up."  (Def.'s Reply at 15.)  The IFR identified the 123 most egregious turbo-charging hospitals based on *historical* FFY 1999 to FFY 2001 data, while the FFY 2004 IPPS Rule "identified approximately fifty hospitals" for which the Secretary believed outlier payments would likely be reduced after reconciliation based on *future* charging practices.  *See* 68 Fed. Reg. at 45476-77.  These two distinct issues do not lend themselves to comparison or trigger any duty for the Secretary to explain her unspoken rejection of the IFR's consideration of excluding data from the 123 worst turbo-charging hospitals.

implicit rejection of an exclusion of data from the 123 hospitals is not the type of "reasonably obvious alternative" for which an agency must explain its rejection. *See Nat'l Shooting Sports Found.*, 716 F.3d at 215 ("While an agency must consider and explain its rejection of 'reasonably obvious alternative[s],' it need not consider every alternative proposed nor respond to every comment made." (quoting *Natural Res. Def. Council, Inc. v. S.E.C.*, 606 F.2d 1031, 1053 (D.C. Cir. 1979)); *see also Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012) ("An agency's obligation to respond . . . is not 'particularly demanding.'"); *City of Brookings Mun. Tel. Co. v. F.C.C.*, 822 F.2d 1153, 1169 (D.C. Cir. 1987) (duty to consider reasonable alternatives extends only to "significant and viable" alternatives). As the Secretary argues, there is nothing talismanic, let alone "reasonably obvious," about the number 123 such that the Secretary needed to explain why she did not exclude data from those 123 hospitals. (Def.'s Reply at 17-18; Def.'s Suppl. Mem. at 5.) And the Secretary's consideration of excluding data from that particular number of hospitals in a *prior* rulemaking that utilized *now-outdated* data and which was ultimately not adopted in that rulemaking, *Outlier Correction Rule*, 68 Fed. Reg. at 34505-06, does not render that alternative so "obvious" that the Secretary need address it, unprompted by commenters, in a subsequent rulemaking.

Further, although excluding data from those 123 hospitals may have been a reasonable option for the Secretary to pursue, it does not follow that the Secretary's decision to include data from those (or, indeed, any) turbo-charging hospitals necessarily would be unreasonable. The Secretary's choice to calculate the charge inflation factor with a dataset including the 123 hospitals most notorious for turbo charging could overstate inflation rates and result in an excessively high fixed loss threshold. However, regardless of the methodology used, those 123 hospitals continued receiving outlier payments after the Outlier Correction Rule, and failing to

account at all for those hospitals could *under*state the charge inflation factor and result in an excessively low fixed loss threshold.  (*See* Def.'s Reply at 16-17.)  As the D.C. Circuit has clarified, a decision "to include a suspicious data point because it was relevant" – what the Secretary did here – and a decision to "exclude a relevant data point because it was suspicious" – what the Secretary considered in the IFR – are both "rational" choices.  *Bell Atl. Tel. Cos. v. F.C.C.*, 79 F.3d 1195, 1203 (D.C. Cir. 1996); *cf. Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1233 (9th Cir. 1993) ("The agency simply chose one imperfect database over another while seeking to develop data superior to either.  This choice was rational.").

Unable to avoid the fact that the Secretary did not need to address the possibility of excluding data from the 123 hospitals unless that proposal was a "reasonably obvious alternative," *Nat'l Shooting Sports Found.*, 716 F.3d at 216-17, plaintiffs argue more generally that the Secretary failed to "properly account for the effect of her regulatory changes on hospital behavior."  (Pls.' Mot. at 34.)[11]  In so arguing, plaintiffs cite *County of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999), and *Alvarado Community Hospital v. Shalala*, 155 F.3d 1115 (9th Cir. 1998).  However, those cases provide no support for plaintiffs' position.

Plaintiffs in *County of Los Angeles* and *Alvarado* challenged the fixed loss threshold set for FFY 1985 on the ground that the Secretary used 1981 MedPAR data, rather than preliminary and incomplete 1984 MedPAR data, when setting the threshold.  *Cnty. of Los Angeles*, 192 F.3d at 1020; *Alvarado*, 155 F.3d at 1121.  Both the D.C. and the Ninth Circuits held that the Secretary failed to provide "adequate explanation for the decision to rely on the 1981 MedPAR data rather than more recent data that would reflect" recent regulatory changes post-dating the

---

[11] As noted above, the Secretary accounted for the Outlier Correction Rule in the final FFY 2004 fixed loss threshold, resulting in a final threshold she estimated to be $17,000 lower than if she had not accounted for the Rule.  *See FFY 2004 IPPS Rule*, 68 Fed. Reg. at 45477.  Thus, plaintiff's argument, more properly stated, is that the Secretary did not *sufficiently* account for the effect of the Outlier Correction Rule on hospital behavior.

1981 data. *Alvarado*, 155 F.3d at 1122; *see also Cnty. of Los Angeles*, 192 F.3d at 1021

(agreeing with *Alvarado*). Notably, however, neither court concluded that the Secretary failed to

adequately account for regulatory changes when setting the fixed loss threshold; rather, those

courts faulted the Secretary on the narrow ground that she failed to explain why she did not

calculate the threshold using more recent and available (even if incomplete) data that should

have reflected hospitals' behavioral changes in response to the new regulatory regime.[12] In this

case, there is no evidence in the administrative record that at the time of the FFY IPPS 2004

Rulemaking the Secretary had available any analogous and more recent data that could have

been used to more accurately account for the changes in hospital behavior brought about by the

Outlier Correction Rule.[13] Without such data, *County of Los Angeles* and *Alvarado* are

---

[12] Indeed, the D.C. Circuit did not conclude that using the 1981 MedPAR data necessarily was *per se* unreasonable, but rather remanded the issue back to the Secretary for further explanation. *See Cnty. of Los Angeles*, 192 F.3d at 1023 (remanding to Secretary to recalculate of outlier threshold *"or to offer a reasonable explanation for refusing to use the 1984 data in setting outlier thresholds during those years"*). The D.C. Circuit's decision to remand for further agency explanation only further highlights that the decision focused, first and foremost, on the data considered and not, as plaintiffs suggest, on a general (and incurable) failure to account for regulatory changes.

[13] For this same reason, plaintiffs' related argument that the Secretary did not use the "best available data" for estimating future charges (Pls.' Mot. at 35-36) also fails. Plaintiffs cannot succeed on a "best available data" claim based on vague and generalized assertions that better data existed at the time of the decision without pointing to evidence that such data actually existed. *Cf. Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 61 (D.C. Cir. 2000) (holding that, where agency was under a duty to make statutory determinations "on the basis of the best available data," the district court erred in imposing "an obligation upon the [agency] to find better data"); *Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 49 n.31 (D.D.C. 2008) ("Of course, a court cannot require an agency to develop data that does not presently exist."). To the extent plaintiffs purport to argue that the "best available data" are that which excludes data from the 123 turbo-charging hospitals, the Court rejects this argument for the same reasons as noted above. *See Mt. Diablo Hosp.*, 3 F.3d at 1233. And to the extent plaintiffs suggest that the Secretary should have used more recent partial-year data to calculate the charge inflation factor, as she did in the FFY 2005 IPPS Rulemaking, *see Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates* ("FFY 2005 IPPS Rule"), 69 Fed. Reg. 48916, 49277 (Aug. 11, 2004), there is no evidence that such partial-year data existed or was available to the Secretary at the time of the FFY 2004 IPPS Rulemaking. In any event, plaintiffs cannot use changes adopted in a later rulemakings to question the reasonableness of earlier rulemakings. *See Alvin Lou Media, Inc. v. F.C.C.*, 571 F.3d 1, 12 (D.C. Cir. 2009) (noting that a proposed change in FCC policy that brought auction procedures in line with those long-proposed by commenters does not affect the reasonableness "is of no moment" to whether prior procedures were reasonable when adopted); *see also*

inapposite and the Court concludes that the Secretary acted reasonably when she calculated the charge inflation factor for the FFY 2004 IPPS Rule by using data from all participating hospitals.

## B.     COST-TO-CHARGE RATIOS

Although plaintiffs concede that the Secretary attempted to calculate more accurate cost-to-charge ratios in the wake of the Outlier Correction Rule by relying on the latest tentatively settled cost reports, rather than the latest settled cost reports (*see* Pls.' Mot. at 21-22), they argue that the Secretary did not go far enough to compensate fully for predictable changes in hospital behavior.  In particular, plaintiffs make three arguments:  (1) that using the "latest tentatively settled cost report" still resulted in cost-to-charge ratios based on data that was outdated and inadequately reflective of the Outlier Correction Rule (*id.* at 38-40); (2) that the Secretary failed to account for the Outlier Correction Rule's termination of defaulting certain hospitals' cost-to-charge ratios to the statewide average (*id.* at 41); and (3) that the Secretary failed to account for the Outlier Correction Rule's post-payment reconciliation mechanism, which would lower the cost-to-charge ratios for some reconciled hospitals.  (*Id.* at 41-43).[14]

_____

*James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (limiting review of administrative decision to the administrative record "before the agency at the time the decision was made" (internal quotation marks omitted)).

[14] In their complaint, plaintiffs alleged that "the Secretary failed to consider use of the 'cost methodology,' rather than the 'charge methodology,' in setting outlier thresholds, despite the fact that the cost methodology had been more accurate in predicting outlier payments in prior years."  (Compl., Jan. 19, 2011 [Dkt. No. 1] at 33.)  Plaintiffs now limit their discussion of the "cost" versus "charge" methodologies to a single footnote, stating only that "[i]n response to the FFY 2004, 2005, and 2006 proposed rules, several hospitals submitted comments to the Secretary asking her to return to cost methodology for calculation of the inflation adjustment factor."  (Pls.' Mot. at 38 n. 36.)  Because plaintiffs fail to provide any argument for why the Secretary's choice to use a "charge methodology" for FFYs 2004-2006 is arbitrary and capricious, the Court considers this allegation to have been abandoned.  In any event, the Court finds the Secretary adequately explained her reasonable choice to continue using a "charge methodology" to set fixed loss thresholds for FFYs 2004-2006.  *See FFY 2004 IPPS Rule*, 68 Fed. Reg. at 45476 (adopting rationale of FFY 2003 IPPS Rule); *FFY 2005 IPPS Rule*, 69 Fed. Reg. at 49277 ("[W]e believe the use of charge inflation is more appropriate than our previous methodology of cost inflation because charges tend to increase at a much faster rate than costs.");  *Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006 Rates* ("FFY 2006

## 1. Latest tentatively settled cost reports

Before the Outlier Correction Rule, fiscal intermediaries calculated cost-to-charge ratios using the latest settled cost reports. *See Outlier Correction Rule*, 68 Fed. Reg. at 34497. Because the cost reports had to be fully settled before they could be used, there existed a time lag between a hospital's charges and those charges' reflection in a settled cost report used by fiscal intermediaries. For instance, cost-to-charge ratios calculated and used to set the FFY 2003 fixed loss threshold were based on "cost reports that began in FY 2000 or, in some cases, FY 1999 or even earlier." *Id.* Hospitals took advantage of this several-year time lag by turbo charging: hospitals' dramatic increases of charges at a greater rate than costs during the time lag, while fiscal intermediaries applied higher historical cost-to-charge ratios, caused overestimated hospital costs and resulted in overpayments to the turbo-charging hospitals. *Id.*; *see also supra* note 9.

In response, the Outlier Correction Rule's first step to address turbo charging was to allow fiscal intermediaries to use the latest tentatively settled cost reports to calculate cost-to-charge ratios. *See id.* at 34497-98. Providing this alternative data source for fiscal intermediaries significantly reduced the time lag in the IPPS process:

> Hospitals must submit their cost reports within 5 months after the end of their fiscal year. CMS makes a decision to accept a cost report within 30 days. Once the report is accepted, CMS makes a tentative settlement of the cost report within 60 days. . . . After the cost report is tentatively settled, it can take 12 to 24 months, depending on the type of review or audit, before the cost is final-settled. Thus, using cost-to-charge ratios from tentative settled cost reports . . . reduces the time lag for updating cost-to-charge ratios by a year or more.

---

IPPS Rule"), 70 Fed. Reg. 47278, 47495 (Aug. 12, 2005) (continuing to use charge methodology because, *inter alia*, it "more closely captures how actual outlier payments are calculated").

*Id.* at 34497.[15]  As described above, for the FFY 2004 IPPS Rule, the Secretary had to "approximate[]" the latest tentatively settled cost reports.  *See FFY 2004 IPPS Rule*, 68 Fed. Reg. at 45476.

Plaintiffs challenge the Secretary's use of approximated tentatively settled cost reports on two grounds.  First, plaintiffs argue that the Secretary failed to adequately explain how she "approximated" the tentatively settled cost reports for FFY 2004.  (Pls.' Mot. at 39-40.)  While the Secretary's description of her "approximation" process, *see FFY 2004 IPPS Rule*, 68 Fed. Reg. at 45476, may not be a paragon of clarity, it is not so unclear as to be unreasonable.   For "a court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (internal quotation marks and citations omitted).  Here, it is reasonably discernable that the Secretary used provider-specific data from the most recent cost reporting year to approximate, in a logical manner, what the latest tentatively settled cost reports would have provided, if available.  *See FFY 2004 IPPS Rule*, 68 Fed. Reg. at 45476. This is sufficient under the APA.

Second, and more fundamentally, plaintiffs argue that the Secretary's use of latest tentatively settled cost reports (even approximated ones) was unreasonable because the data underlying the reports were outdated and failed to reflect the continuing trend in declining cost-to-charge ratios.  (Pls.' Mot. at 38-39; Pls.' Suppl. Mem. at 4, 9.)  And because the latest tentatively settled cost reports for FFY 2004 would be based on data from, depending on the

---

[15] The Secretary noted that, notwithstanding the use of the tentatively settled cost reports, in some instances "there would still be a lag of 1 to 2 years during which a hospital's charges may still increase faster than costs," providing hospitals the opportunity to turbo charge.  *See Outlier Correction Rule*, 68 Fed. Reg. at 34497.  To address this possibility, the Secretary promulgated her reconciliation provision, discussed *infra*.  *See id.* at 34497-98.

hospital, FFYs 2001 or 20002, the reports would not be reflective at all of hospitals' behavioral changes caused by the Outlier Correction Rule.[16] (Pls.' Mot. at 38-39.) Plaintiffs suggest that the Secretary should have accounted for the "predictable decrease" in cost-to-charge ratios that occurred during the time lag between the data underlying the latest tentatively settled cost report and when costs were incurred during FFY 2004. (*Id.* at 38.)

Notably, however, plaintiffs offer no specific suggestions as to how the Secretary should have accounted for a trend in decreasing cost-to-charge ratios. And, considering that the Secretary's application of an (approximated) latest tentatively settled cost report (and other provisions of the Outlier Correction Rule) resulted in a significant decrease in cost-to-charge ratios and, in effect, the fixed loss threshold from the FFY 2004 IPPS Proposed Rule, *see* 68 Fed. Reg. at 45477, it is apparent that a significant decrease in applicable cost-to-charge ratios already was captured by the new methodologies inherent in the Outlier Correction Rule. Any additional consideration of decreasing cost-to-charge ratios would require projections of changes in hospital behavior (and thus cost-to-charge ratios) at the expense of the use of historical data. Given the deferential standard that the Court is to apply, *see West Virginia*, 362 F.3d at 868, it will not invalidate the Secretary's decision to use actual historical data when setting the fixed loss threshold.

## 2. Defaulting to statewide averages

Prior to the Outlier Correction Rule, the Secretary would apply statewide average cost-to-charge ratios to those hospitals whose cost-to-charge ratios fell "below the range considered reasonable under regulations." *Outlier Correction Rule*, 68 Fed. Reg. at 34499. The Outlier

_____

[16] Although the Secretary intended the Outlier Correction Rule to eliminate turbo charging (which itself caused decreasing cost-to-charge ratios), the rule predictably would cause lower cost-to-charge ratios, at least in the short term, by utilizing more recent data reflective of the turbo charging that had occurred prior to rule's promulgation.

Correction Rule identified this default to statewide averages as a "vulnerability" of which certain hospitals had taken advantage "to maximize their outlier payments," *id.* at 34496, by increasing their "charges at extreme rates." *Id.* at 34499. By defaulting to statewide averages, the Secretary found that forty-three turbo-charging hospitals were receiving higher outlier payments than they would have if their actual cost-to-charge ratios were applied. *Id.*

The Outlier Correction Rule terminated the practice of defaulting to statewide averages when hospitals' cost-to-charge ratios fall below the prior-defined reasonableness threshold. *See id.* at 34499-500. Because the hospitals that had previously defaulted to statewide averages would now have their actual (and very low) cost-to-charge ratios applied, this change in policy would result in (all other things being equal) a decline in the fixed loss threshold. As a result, during the FFY 2004 IPPS Rulemaking at least one commenter recommended that the Secretary take into account the elimination of the use of statewide averages when calculating the fixed loss threshold. (*See* FFY 2004 AR 2240 (comment of Fed'n of Am. Hosps.)

Plaintiffs assert that the Secretary "never addressed in the Rulemakings how she accounted for the change in policy regarding default to statewide averages." (Pls.' Mot. at 41.) Although plaintiffs are correct that the Secretary did not *directly* address how she accounted for the elimination of the statewide averages, she clearly accounted for the change in policy. *See FFY 2004 IPPS Rule*, 68 Fed. Reg. at 45476 ("To calculate the FY 2004 outlier thresholds, we simulated payments by *applying FY 2004 rates and policies* using cases from the FY 2002 MedPAR file (emphasis added); *see also id.* at 45477 ("As described above, we are reflecting the changes made to outliers from the [Outlier Correction Rule]. These changes have resulted in a substantial reduction in the outlier threshold from the proposed level."); *id.* at 45661-63 & tbl. I col. 2 & n.2 (regulatory impact analysis showing that policies of Outlier Correction Rule

amounted to a lower fixed loss threshold for FFY 2004). Further, the Court notes that elimination of the use of statewide averages seems to account for itself in the fixed loss threshold calculation. Because the statewide average policy substituted statewide averages for actual (very low) cost-to-charge ratios, the policy's discontinuance merely defaulted back to the exclusive use of actual cost-to-charge ratios when calculating the fixed loss threshold. *Cf. id.* at 45476.

Finally, to the extent that plaintiffs suggest that the Secretary should have (by some undefined means) attempted to project how the elimination of the statewide average policy (which applied to only forty-three hospitals in FFY 2003) would affect hospital behavior and thus cost-to-charge ratios more generally, the Court defers to the Secretary's decision not to undertaking the task of modeling the undoubtedly complex and attenuated effects of the policy on hospital behavior. *See West Virginia*, 362 F.3d at 868.[17]

### 3. Reconciliation

In the Outlier Correction Rule, the Secretary also attempted to address the threat that, notwithstanding other actions intended to end turbo charging, a hospital could still "dramatically increase its charges by far above the rate-of-increase in costs during any given year" and therefore take advantage of the inherent time lag in the IPPS process to "manipulate the system to maximize outlier payments." *Outlier Correction Rule*, 68 Fed. Reg. at 34503; *see also id.* at 34501. The Secretary therefore adopted a cost report reconciliation process whereby fiscal intermediaries would reconcile outlier payments on "a limited basis" when a hospital's *actual* cost-to-charge ratios were found to be substantially different from those ratios (from the tentatively settled cost reports) used to make the initial outlier payments. *See id.* at 34501-03.

_____

[17] It is unclear whether plaintiffs challenge the FFYs 2005 and 2006 IPPS Rules on any grounds related to the Outlier Correction Rule's changes in statewide average policy. To the extent they do, the Court declines to reach the merits because plaintiffs have not identified comments which raised the issue before the agency during either rulemaking. *See Nat'l Wildlife Fed'n*, 286 F.3d at 562.

For those hospitals, the reconciled outlier payments "would be based on the relationship between the hospital's costs and charges at the time a discharge occurred" such that the payments "would reflect an accurate assessment of the actual cost the hospital incurred," rather than a projection of cost based on cost-to-charge ratios calculated using hospitals' most recent tentatively settled cost report at the time of initial outlier payment. *See id.* at 34501.

Plaintiffs argue that reconciliation, even on a limited basis, "punishes hospitals if their [cost-to-charge] ratios are too high" and was thus intended "to lower [cost-to-charge] ratios that are too high." (Pls.' Mot. at 41.) According to plaintiffs, including cost-to-charge ratios from hospitals potentially subject to reconciliation when calculating the fixed loss threshold overestimates costs and overstates the fixed loss threshold. (*Id.*; *see also, e.g.*, FFY 2004 AR at 2200.75-.76 (comment of Am. Hosp. Assoc.).) Plaintiffs accordingly assert that the Secretary acted arbitrarily and capriciously by not accounting for the effect of reconciliation on the fixed loss threshold calculation.[18] (Pls.' Mot. at 41.)

Although the Secretary did not adjust her overall methodology for calculating the fixed loss threshold to account for potential reconciliations, the Secretary did not ignore the issue. Instead, the Secretary explained that it was impossible to predict the full effects of reconciliation in advance because

> it is difficult to project which hospitals will be subject to reconciliation of their outlier payments using available data. For example, for most hospitals, the latest available cost data are from FY 2000. In addition, the amount of fiscal intermediary resources necessary to undertake reconciliation will ultimately

---

[18] Plaintiffs also assert that the Secretary addressed reconciliation in the IFR "by excluding data from the 123 turbo-charging hospitals, which are the hospitals most likely to be subject to reconciliation," and thus suggests she should have done so for the FFY 2004 IPPS Rule. (Pls.' Mot. at 41.) However, the IFR at no point states that its proposed exclusion of data from 123 turbo-charging hospitals is meant to address the effects of reconciliation on the fixed loss threshold calculation. (*See* FFY 2004 AR 2264-68.) Indeed, as noted *supra* note 10, the issues of charge inflation and reconciliation, although related, are distinct.

influence the number of hospitals reconciled. Without actual experience with the reconciliation process, it is difficult to predict the number of hospitals that will be reconciled.

*FFY 2004 IPPS Rule*, 68 Fed. Reg. at 45476. Nevertheless, for those hospitals the Secretary projected face reconciliation, the Secretary did "attempt[] to project each hospital's [reconciled] cost-to-charge ratio based on its rate of increase in charges per case based on FY 2002 charges, compared to costs." *Id.* at 45476-77. The Court finds the Secretary's decision, which implicates her predictive expertise as applied to a complex and newly implemented procedure, to be reasonable and adequately responsive to plaintiffs' (and commenters') concerns. *See Cablevision Sys. Corp.*, 649 F.3d at 714.[19]

## III.    FFY 2005 FIXED LOSS THRESHOLD DETERMINATION

In the FFY 2005 IPPS Rulemaking, the Secretary explained that "[d]ue to the limited time from the publication of the [Outlier Correction Rule] to the publication of the IPPS final rule for FY 2004," she had "insufficient data to determine the full impact" the Outlier Correction Rule "would have on hospital charges" when the FFY 2004 IPPS Rule was finalized. *FFY 2005 IPPS Rule*, 69 Fed. Reg. at 49277. However, the Secretary had "more recent data reflecting the impact of the [Outlier Correction Rule] upon hospital charges" during the FFY 2005 IPPS Rulemaking. *Id.* Thus, after initially proposing a $35,085 fixed loss threshold for FFY 2005, *id.* at 49276, the Secretary "revised [her] methodology" for calculating the fixed loss threshold "to address both the changes to the outlier payment methodology [from the Outlier Correction Rule] and the exceptionally high rate of hospital charge inflation that is reflected in the data for FYs 2001, 2002, and 2003." *Id.* at 49277. As a result of these changes in methodology, the Secretary established a fixed loss threshold of $25,800 for FFY 2005. *Id.* at 49278.

_____

[19] The Court also finds reasonable the Secretary's implicit decision not to attempt to predict how reconciliation might influence future hospital behavior and cost-to-charge ratios for the purposes of setting the FFY 2004 fixed loss threshold. *See West Virginia*, 362 F.3d at 868.

Relevant to this case, the Secretary changed her methodology for calculating the charge inflation factor for FFY 2005. *Id.* at 49277. "Instead of using the 2-year average annual rate of change in charges per case from FY 2001 to FY 2002 and FY 2002 to FY 2003," as she had in prior years, the Secretary used "more recent data to determine the annual rate of change in charges for the FY 2005 outlier threshold." *Id.* Specifically, the Secretary began utilizing the "first half-year of data from FY 2003 and comparing this data to the first half year of data for FY 2004." *Id.* The Secretary explained that this comparison, using the "most recent charge data available" would "result in a more accurate determination of the rate of change in charges per case between FY 2003 and FY 2005" than a comparison of charge increases from FFYs 2001 to 2002 and FFYs 2002 to 2003. *Id.*

In contrast, the Secretary did not change her methodology for calculating cost-to-charge ratios. As in FFY 2004, the Secretary "used hospital cost-to-charge ratios from the most recent Provider Specific File, in this case the April 2004 update." *Id.* The Secretary did not believe that it was necessary to make an adjustment to her methodology for computing cost-to-charge ratios to account for any decline in cost-to-charge ratios brought about by the Outlier Correction Rule. *Id.* In support of her position, the Secretary explained that, in the FFY 2004 IPPS Rulemaking, she had "already taken into account the most significant factor in the decline in cost-to-charge ratios, specifically, the change from using the most recent final settled cost report to the most recent tentatively settled cost report." *Id.* Moreover, the Secretary expressed a "strong[]" preference to utilize "actual data rather than projections in estimating the outlier threshold because [she] employ[s] actual data in updating charges, themselves." *Id.* at 49277-78.

Although plaintiffs' challenges to the FFY 2005 IPPS Rule are far from clear, plaintiffs seem to attack the Secretary's methodologies for calculating both the charge inflation factor and

cost-to-charge ratios.  (Pls.' Mot. at 23-24; Pls.' Reply at 11-12.)  As with the FFY 2004 IPPS

Rule, plaintiffs assert that her methodological decisions once again "overstated the outlier

threshold, resulting in a significant payment reduction to hospitals."  (Pls.' Mot. at 24.)

### A.    CHARGE INFLATION FACTOR

Plaintiffs seem to challenge the FFY 2005 IPPS Rule's charge inflation factor

methodology on grounds similar to those relied on with regard to the FFY 2004 IPPS Rule – *i.e.*,

that the Secretary used data including the 123 turbo-charging hospitals.  (*See* Pls.' Reply at 11-

12.)  Although this argument would fail for the same reasons already discussed, it also fails for

the more basic reason that there is no evidence that a proposal to exclude data from those 123

hospitals was before the Secretary during the FFY 2005 IPPS Rulemaking.  The IFR is not part

of the Administrative Record for the FFY 2005 IPPS Rule.  (*See* 9/19/13 Mem. Op. & Order at

21-22 & n.13.)  And, plaintiffs have not pointed to any comments that raise the issue of

excluding data from any (let alone 123) turbo-charging hospitals when calculating the charge

inflation factor.  "It is well established that issues not raised in comments before the agency are

waived and this Court will not consider them."  *Nat'l Wildlife Fed'n v. E.P.A.*, 286 F.3d 554, 562

(D.C. Cir. 2002).  Accordingly, plaintiffs are barred from challenging the FFY 2005 IPPS Rule

on this ground.

### B.    COST-TO-CHARGE RATIOS

Plaintiffs challenge the reasonableness of the FFY 2005 IPPS Rule on two grounds

relating to cost-to-charge ratios.  First, plaintiffs argue that, even by FFY 2005, the use of "latest

tentatively settled cost report" would still provide outdated cost-to-charge ratios based on pre-

Outlier Correction Rule data.  (*See* Pls.' Mot. at 38-41.)  Second, plaintiffs again argue that the

Secretary arbitrarily failed to account for reconciliation of certain hospitals' cost-to-charge ratios when calculating the fixed loss threshold. (*See id.* at 41-42.)

### 1. Latest tentatively settled cost reports

Several commenters during the FFY 2005 IPPS Rulemaking suggested that the Secretary compensate for the predicted decline in cost-to-charge ratios following the Outlier Correction Rule by reducing historical cost-to-charge ratios based on some reduction factor. (*See, e.g.*, FY 2005 AR at 1979.82, .85 (comment of the Fed'n of Am. Hosp.); *id.* at 2123.41796, .41799 (comment of the Cal. Hosp. Ass'n.).)[20] The Secretary summarized these comments in the FFY 2005 IPPS Rule. *See* 69 Fed. Reg. at 49276 ("The [commenters'] data analysis . . . accounted for the fact that hospitals' CCRs are expected to decline throughout the fiscal year as a result of the use of more current data reflecting changes in hospital charging practices after the [Outlier Correction Rule]".) The Secretary responded that:

> We do not believe it is necessary to make a specific adjustment to our methodology for computing the outlier threshold to account for any decline in cost-to-charge ratios in FY 2005, as the commenter has requested. We have already taken into account the most significant factor in the decline in cost-to-charge ratios, specifically, the change from using the most recent final settled cost report to the most recent tentatively settled cost report. Furthermore, we strongly prefer to employ actual data rather than projections in estimating the outlier threshold because we employ actual data in updating charges, themselves. However, we will continue to monitor the experience and evaluate whether further requirements to our methodology are warranted.

*Id.* at 49277-78.

The Secretary's reasoned determination "to employ actual data rather than projections in estimating the outlier threshold," *id.*, is a "prediction resting on the agency's evaluation of past performance and its expert judgment how the measures it implemented" – here, the Outlier

---

[20] As the with FFY 2004 IPPS Rulemaking, data underlying the latest tentatively settled cost reports used to set the FFY 2005 fixed loss threshold pre-dated the Outlier Correction Rule. (Pls.' Mot. at 39.)

Correction Rule – "will operate in the future." *Oceana, Inc. v. Gutierrez*, 488 F.3d 1020, 1025 (D.C. Cir. 2007). Because the use of actual data rather than projections in this situation is, as it was for FFY 2004, "within the bounds of reason," *id.*, this Court will not disturb the Secretary's determination. *See also North Carolina v. F.E.R.C.*, 112 F.3d 1175, 1190 (D.C. Cir. 1997) (concluding that the fact that a particular population estimates was "less 'reasonable'" than other options does not render those estimates unreasonable or arbitrary).

## 2. Reconciliation

For FFY 2005, the Secretary determined she would "not includ[e] in the calculation of the outlier threshold the possibility that hospitals' cost-to-charge ratios may be reconciled upon cost report settlement." *FFY 2005 IPPS Rule*, 69 Fed. Reg. at 49278. This decision represented a change from the FFY 2004 IPPS Rule, where the Secretary had attempted to project hospitals' reconciled cost-to-charge ratios when calculating the fixed loss threshold. *See FFY 2004 IPPS Rule*, 68 Fed. Reg. at 45476-77.

Commenters for the FFY 2005 IPPS Rule urged the Secretary to take into account the effects of the Outlier Correction Rule, including reconciliation, when setting the fixed loss threshold.[21] (*See, e.g.*, FFY 2005 AR 1764 (comment of Catholic Healthcare W.).) Plaintiffs argue that the Secretary's decision not to account for the potential of reconciliation in FFY 2005 is "inconsistent" with her position in the FFY 2004 IPPS Rule and is therefore is arbitrary and capricious. (Pls.' Mot. at 42.)

---

[21] More specifically, the commenters suggested that because overall outlier payments had decreased following the Outlier Correction Rule (of which reconciliation was a part), that the fixed loss threshold should be reduced in response. (*See, e.g.*, FFY 2005 AR 1753 (comment of Neb. Hosp. Ass'n); *id.* at 1764 (comment of Catholic Healthcare W.); *id.* at 1837 (comment of N.J. Hosp. Ass'n); *id.* at 1905 (comment of Tenn. Hosp. Ass'n).) However, none of the comments provided any suggestions on how to project the future effects of reconciliation in particular. Indeed, one commenter that did propose an alternative methodology for calculating the fixed loss threshold specifically did "not take into account the potential impact of outlier reconciliation." (*Id.* at 2123.41788 (comment of Cal. Healthcare Ass'n).)

However, the Secretary explained in the FFY 2005 IPPS Rule why she did not factor the possibility of reconciliation into her fixed loss threshold calculation:

> [W]e believe that due to changes in hospital charging practices following implementation of the [Outlier Correction Rule], the majority of hospitals' cost-to-charge ratios will not fluctuate significantly enough between the tentatively settled cost report and the final settled cost report to meet the criteria to trigger reconciliation of their outlier payments. Furthermore, it is difficult to predict which specific hospitals may be subject to reconciliation in any given year. As a result, we believe it is appropriate to omit reconciliation from the outlier threshold calculation.

69 Fed. Reg. at 49278. That hospitals were less likely to face reconciliation in FFY 2005 than in FFY 2004, combined with the continued difficulty of predicting *which* hospitals would face reconciliation, compels the Court to conclude that it was reasonable for the Secretary to decide, in contrast to her decision in FFY 2004, not to factor the reconciliation process into the fixed loss threshold calculation for FFY 2005.

## IV. FFY 2006 FIXED LOSS THRESHOLD DETERMINATION

The Secretary retained the same methodology for calculating the fixed loss threshold in FFY 2006 as she had used for the FFY 2005 IPPS Rule. *See FFY 2006 IPPS Rule*, 70 Fed. Reg. at 47494. She used part-year data from FFYs 2004 and 2005 to calculate the inflation factor, *id.*, and once again used the latest tentatively settled cost reports to calculate cost-to-charge ratios. *Id.* at 47495. Although she initially proposed a fixed loss threshold of $26,675, the Secretary set the fixed loss threshold for FFY 2006 at $23,600. *Id.* at 47494. Plaintiffs once again seem to challenge the Secretary's methodologies for calculating the charge inflation factor and cost-to-charge ratios for FFY 2006. (*See* Pls.' Mot. at 24; Pls.' Reply at 11-12.)

### A. CHARGE INFLATION FACTOR

Plaintiffs appear to fault the FFY 2006 IPPS Rule's charge inflation factor methodology based on the same rationale which they challenged the FFYs 2004 and 2005 IPPS Rules –

because the Secretary used data from the 123 turbo-charging hospitals mentioned in the IFR. (*See* Pls.' Reply at 11-12.) As was the case with the FFY 2005 IPPS Rulemaking, the IFR is not part of the FFY 2006 IPPS Rule administrative record, and plaintiffs cannot point to any comments suggesting the Secretary should have excluded data from any turbo-charging hospitals when calculating the FFY 2006 charge inflation factor. Accordingly, plaintiffs are barred from challenging the FFY 2006 IPPS Rule on this ground. *See Nat'l Wildlife Fed'n*, 286 F.3d at 562.

## B.      COST-TO-CHARGE RATIO

As to cost-to-charge ratios, plaintiffs challenge the reasonableness of the FFY 2006 IPPS Rule on the same grounds that they challenged the FFY 2005 IPPS Rule: (1) that even by FFY 2006, the use of the latest tentatively settled cost reports would still provide cost-to-charge ratios that, at most, reflected only five months of post-Outlier Correction Rule data (*see* Pls.' Mot. at 39-41); and (2) that the Secretary failed to account for reconciliation of certain hospitals' cost-to-charge ratios when calculating the fixed loss threshold. (*See id.* at 41-42.)

### 1.      Latest tentatively settled cost reports

During the FFY 2006 IPPS Rulemaking, commenters again implored the Secretary to adjust the latest tentative settled cost reports' cost-to-charge ratios downward to reflect the continued projected decreases in cost-to-charge ratios. (*See* FY2006 AR 1288 (comment of Am. Hosp. Ass'n); *id.* at 1398 (comment of Fed'n of Am. Hosp.).) The Secretary squarely addressed the comments "suggesting that [she] . . . adjust the cost-to-charge ratios that are used in setting the outlier thresholds." *FFY 2006 IPPS Rule*, 70 Fed. Reg. 47495. The Secretary, again rejecting the commenters' recommendation, explained

> We believe it is necessary to inflate the charges from the FY 2004 MedPAR file to project charge levels for FY 2006, but we do not believe it is also necessary to adjust cost-to-charge ratios from the March 2005 Provider-Specific File. . . . We

likely would greatly underestimate payments if we did not inflate the MedPAR charge data.

On the other hand, the cost-to-charge ratios from the March 2005 Provider-Specific File reflect much more recent hospital-specific data than the case-specific data in the FY 2005 MedPAR file. The March 2005 Provider-Specific File includes the cost-to-charge ratios from the hospitals' most recent tentatively-settled cost report. In many cases, for part of FY 2006, fiscal intermediaries will determine actual outlier payment amounts using the same cost-to-charge ratios that are in the March 2005 Provider-Specific File. Fiscal intermediaries will begin using an updated cost-to-charge ratio to calculate the outlier payments for a hospital only after a more recent cost report of the hospital has been tentatively settled.

*Id.*

Although the Secretary's rationale in FFY 2006 was distinct from that given in FFY 2005, it is no less reasonable. Indeed, the fact that the cost-to-charge ratios used to calculate the fixed loss threshold are actually used, for some portion of the fiscal year, to calculate outlier payments, is a strong reason to not adjust the cost-to-charge ratios downward based on speculation regarding the continued downward trend in cost-to-charge ratios. Accordingly, the Secretary acted reasonably when deciding to continue utilizing actual data from the latest tentatively settled cost reports when calculating the fixed loss threshold for FFY 2006.

## 2. Reconciliation

As in the FFY 2005 IPPS Rulemaking, the Secretary "did not make any adjustment for the possibility that hospitals' cost-to-charge ratios and outlier payments may be reconciled upon cost report settlement." *FFY 2006 IPPS Rulemaking*, 70 Fed. Reg. 47495. The Secretary again explained that, due to the Outlier Correction Rule, "few hospitals, if any, will actually have these ratios reconciled" and that it would be difficult to predict *ex ante* "which specific hospitals will have cost-to-charge ratios and outlier payments reconciled in any given year." *Id.* For the same

reasons (and in response to the same challenges) as indicated above with regard to the FFY 2005 IPPS Rule, the Court finds the Secretary's decision to be reasonable.

## CONCLUSION

For the foregoing reasons, the Court concludes that the Secretary acted reasonably when setting the fixed loss thresholds for FFYs 2004-2006. Accordingly, the Secretary's motion for summary judgment will be granted, and plaintiffs' cross-motion will be denied. An Order consistent with this Memorandum Opinion will also be issued this date.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   January 6, 2014